No. 47,478

Kay L. Dawson, *Appellant,* v. Associates Financial Services Company of Kansas, Inc. and Capitol Life Insurance Company of South Bend, Indiana, *Appellees.*

(529 P. 2d 104)

Opinion filed December 7, 1974.

*Thomas E. Brown,* of Irwin, Hylton, Barr, Wall & Brown, of Wichita, argued the cause, and *M. Ralph Baehr,* of Mills & Baehr, of Wichita, was with him on the brief for the appellant.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *John E. Foulston,* of the same firm, was with him on the brief for the appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an action wherein the plaintiff alleged that a finance company, which had financed the plaintiff's purchase of an automobile, intentionally harassed the plaintiff by threats to repossess the plaintiff's automobile knowing full well the plaintiff had multiple sclerosis and knowing full well the plaintiff was making a claim under an insurance policy to cover the loan payments. The trial court directed a verdict in favor of the finance company, and appeal has been duly perfected.

The record discloses on December 15, 1969, Kay L. Dawson (plaintiff-appellant), 25 years of age, purchased an automobile. She financed the purchase by obtaining a loan in the amount of $1,881.11 from Associates Financial Services Company of Kansas, Inc., (defendant-appellee; hereinafter referred to as Associates), a company for which she had worked two years prior to this time. Under the terms of the loan appellant's payments were $93 per month. At the time she obtained the loan she purchased a credit life insurance policy and a health and accident insurance policy underwritten by Capitol Life Insurance Company of South Bend, Indiana, (defendant; hereinafter referred to as Capitol Life). An employee of Associates prepared all the insurance papers for the appellant's signature and told her that she should obtain the two insurance policies. It was stipulated by the parties that Capitol Life is a wholly owned subsidiary of Associates Corporation of North America, and Associates Financial Service of Kansas, Inc., is also a wholly owned subsidiary of the same company.

At the time the appellant obtained the loan and insurance policies she was employed at Cessna Aircraft Company and, to the best of her knowledge, she was in good physical condition. Subsequently, on January 7 or 8, 1970, appellant underwent a routine physical examination. Because the appellant complained about some headaches she was hospitalized at Wesley Medical Center in Wichita, Kansas, on January 19, 1970, for a period of two weeks in order for medical tests to be performed. While in the hospital, the appellant was examined by Dr. Ralph L. Drake, a neurologist in charge of the multiple sclerosis clinic in Wichita. Dr. Drake diagnosed appellant's condition as multiple sclerosis.

From the time the appellant was released from Wesley she was only able to work on a part-time basis at Cessna.

Subsequently, the appellant was referred to the Kansas University

Medical Center. She remained at the center from February 24, 1970, until March 16, 1970. During her stay more tests were conducted, she received some treatment, and she underwent a therapeutic abortion due to the fact that the doctors did not believe she would be able to care for a child because of her inability to walk.

The appellant was next hospitalized for her condition from April 27, 1970, through May 11, 1970, at Wellington Hospital in Wellington, Kansas. At this time the appellant was being treated by Marcus L. Lee, an osteopath practicing in Wellington. When the appellant was admitted into the hospital she was having difficulty walking; had lost sensory perception in her legs; was experiencing double vision, and had difficulty with bladder control. Dr. Lee testified that reassurance is a primary treatment method for multiple sclerosis patients, so he gave supportive-type treatment and physical therapy. When the appellant was released she was ambulatory and, according to the doctor, was doing excellently. Dr. Lee again examined the appellant in October 1970 and she was walking without a noticeable limp and was "doing fine".

On June 23, 1970, the appellant quit working upon the advice of her doctors.

During the latter part of 1970 the appellant received a telephone call from an employee at Associates. The caller asked when the appellant was going to make another payment on the car. The appellant responded that she did not feel responsible for the payments and that Associates should check with Capitol Life.

The appellant received a second call from Associates during the latter part of December 1970. This time the caller stated Associates was going to repossess the car if the payments were not made. The appellant replied that was all right. At this time the balance on the loan was $1,600 and the caller stated that appellant's car would be sold at auction and she would be held responsible for the deficiency. The appellant reiterated that she did not believe she was responsible for the payments because of the health insurance policy she had purchased through Associates.

A few days later the appellant received a third call from Associates. On this occasion the caller asked appellant if she would be home that morning in order for them to come to her house and repossess the car. The appellant answered that if Associates wanted to repossess her automobile they had better have a court order. At that time a Mr. Byrd from Associates talked with the appellant and told her that a repossession would ruin her credit and make it very

difficult to purchase another automobile; he was doing business with the appellant's parents which appellant understood to mean he "could hurt my parents in their business"; and if the car was repossessed the appellant and her parents would have to buy a bond. The appellant replied that Mr. Byrd should contact her attorney.

The appellant received a fourth and final telephone call from Mr. Byrd at Associates several days later in January 1971. The appellant began to cry during the call and told Mr. Byrd not to call her again but to call her attorney. Mr. Byrd replied that he could not locate her attorney's phone number, and also asked if she was sure she wanted to go through an attorney.

The appellant testified that after receiving these phone calls her physical condition worsened; that is, she lost control of her bladder, could not walk without assistance and had difficulty with speech and holding objects such as dishes. She was admitted into Wellington Hospital by Dr. Lee on January 15, 1971. The appellant stated that the phone calls made her extremely nervous and she became so upset at the calls because her parents were in business and she was afraid they would be hurt. Also, she was afraid the repossession would hurt her credit rating so that she would not be able to borrow any money for additional hospitalization if she could not afford it.

Dr. Lee testified the appellant suffered an acute relapse of her condition in January 1971; that stress is an aggravating factor of multiple sclerosis; stress aggravated the appellant's condition; and while the appellant was released after four days of hospitalization and she was ambulatory, her condition was permanently impaired by the relapse.

The appellant stated on cross-examination that no one from Associates ever used any profane language or called her a dead beat or anything similar to that; the callers were firm and stern; at the time of the calls her account was not current, but had been delinquent "all along"; as a former employee she had no special deal with Associates; and while employed at Associates she had made collection calls to people with delinquent accounts and she was not treated any differently than the people she had called.

The appellant was asked on direct examination whether or not phone calls concerning her delinquent payments were made to any parties, other than herself, by Associates and the trial court sustained Associates objection as to relevancy. The appellant's counsel then proffered evidence that would disclose Associates made calls and visits to the appellant's mother, Mrs. Claude Shoffner, for the

purpose of obtaining payments on the appellant's loan, and that Mrs. Shoffner explained to Associates that a claim had been filed with Capitol Life for payment of benefits under the accident and health policy due to her disability. The appellant stated she did not think her mother wanted to upset her, so her mother would just mention that Associates "had been down to check on some of their cases" and on some occasions "they had called late at night and said that they wanted a payment." It was contended before the trial court that Associates' action with respect to the appellant's parents was additional stress which aggravated appellant's condition and should have been admitted into evidence for the jury's consideration.

Mrs. Shoffner testified she had made several payments to Associates on the appellant's loan, after being contacted by Associates and told that Associates expected her to make payments for the appellant.

The witness was also asked on direct examination about telephone calls she had received from Associates and Associates' objection as to relevancy was sustained by the court. Therefore, the appellant proffered Mrs. Shoffner's statements that Associates' employees made phone calls to her about making the appellant's payments and she replied that the insurance company "should take care of the payments." The callers told her they were going to ruin the appellant's credit. Mrs. Shoffner did not tell the appellant about the calls, until they became more threatening, but she did tell the appellant's husband that Associates would repossess the car and sell it at a public auction, and the auction price would be under its true value. A further proffer was made of a letter from Mrs. Shoffner to Associates, dated July 20, 1970, stating that the State Insurance Department had been contacted and, according to them, Capitol Life would have to take care of the appellant's account since she had not been aware of the multiple sclerosis condition at the time she obtained the accident and health policy.

Subsequently, in August 1971, the appellant instituted an action against Associates and Capitol Life. The petition was stated in three counts: Count 1 sought a judgment of $690 and reasonable attorney fees against each defendant for their refusal to make payments on the loan in accordance with the insurance policy; Count 2 alleges that Associates wrongfully and with the intent to harass the plaintiff threatened to reposses plaintiff's automobile, knowing full well the condition of the plaintiff and further knowing full well said

plaintiff was making a claim through the defendants for the payments on her loan to be made under the insurance policy, which resulted in the plaintiff's further disability, and that she was damaged in the amount of $20,000; Count 3 stated that the plaintiff was entitled to $20,000 punitive damages for the defendants' wrongful acts.

At the close of the appellant's evidence, at the trial, except for the testimony of one of the appellee's medical witnesses, which was admitted out of time on the consent of all parties, Associates and Capitol Life each moved the court for a directed verdict.

The trial court sustained Associates' motion and found that plaintiff had failed to produce sufficient evidence to sustain her burden of proof of any of the elements of the alleged tort; as a matter of law, Associates at no time acted with malice, wantonness, or extreme gross conduct; the evidence failed to show that the injury to plaintiff was intentional or that Associates' actions were offensive to a person of ordinary sensibilities or that the damage complained of was reasonably foreseeable; there was no evidence that Associates attempted to vilify or expose the plaintiff to public ridicule; Associates did nothing that it was not entitled to do and there is no evidence it acted in an unreasonable or injurious manner.

Capitol Life's motion for directed verdict was overruled. The court held Capitol Life was indebted to the plaintiff on the claim for benefits under the insurance policy and, *since Capitol Life refused without just cause or excuse to pay the full amount of the plaintiff's claim,* the court allowed the plaintiff reasonable attorney fees under K. S. A. 40-256.

In due time the appellant served upon Associates and Capitol Life a notice of appeal from the trial court's judgment, except the trial court's ruling which granted the appellant reasonable attorney fees, and the appellant's statement of points on appeal. Thereafter, Capitol Life moved for, and was granted, a dismissal of the appeal as to Capitol Life because the statement of points did not place in issue any of the judgments, orders, rulings or findings of the trial court insofar as they pertained to Capitol Life on its obligation under the insurance policy.

While this court has never had occasion to deal with a so-called "debtor harassment" case, the appellant submits that a cause of action does exist in a proper factual situation and urges our adoption of the rule contained in Restatement of Torts (Second) § 46 (1), which provides:

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." (p. 71.)

In comment *e* under the above quoted section, the Institute specifically states that collecting creditors have been held liable for extreme abuse of their relationship with debtors. Also, comment *f* notes that the extreme or outrageous character of the conduct complained of may arise from the actor's knowledge that the other is particularly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.

Modern judicial authority has recognized a cause of action for mental distress directly caused by wanton or outrageous conduct. (86 C. J. S., Torts, § 48; 38 Am. Jur. 2d, Fright, Shock, Etc., §§ 4, 17; Prosser, Law of Torts § 11 [3rd Ed. 1964].)

In discussing the law relative to a "debtor harassment" case we are necessarily concerned with the invasion of one's right of privacy.

In *Johnson v. Boeing Airplane Co.*, 175 Kan. 275, 262 P. 2d 808 the court held:

"In general, the 'right of privacy' is relative to the custom of the time and place, and is to be determined by the norm of the ordinary person—that is, in order for an invasion of such right to be actionable it must be of such manner and nature as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities. As a general rule, recovery may be had without proof of special damage." (Syl. ¶ 2.)

The court later held that it was only unwarranted invasions of the right of privacy that were actionable (*Munsell v. Ideal Food Stores*, 208 Kan. 909, 923, 494 P. 2d 1063).

Recognition of the invasion of the right of privacy as a compensable tort has been recently reaffirmed in *Froelich v. Adair*, 213 Kan. 357, 516 P. 2d 993, where the court said:

" 'One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another, or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable man.' " (p. 358.)

The issue has not been squarely presented in a debtor-creditor situation. In this situation it must be recognized the right to be left alone is qualified by the rights of others. When one accepts credit, the debtor impliedly consents for the creditor to take reasonable steps to pursue payment even though it may result in actual, though not actionable, invasion of privacy. (*Harrison v. Humble Oil & Refining Company*, 264 F. Supp. 89 [D. S. C. 1967].) In the

debtor-creditor situation the right of debtor to privacy is subject to the right of a creditor to take reasonable steps to collect the debt. (See, *Smith v. Wyandotte Furniture Co.*, 154 Kan. 494, 119 P. 2d 478.)

In this area of the developing law, the business community must be given some latitude to pursue reasonable methods of collecting debts even though such methods often might result in some inconvenience or embarrassment to the debtor. (See, *Berrier v. Beneficial Fnance, Incorporated*, 234 F. Supp. 204 [N. D. Ind. 1964].) Debtors cannot object to some inconvenience in connection with their creditor's efforts to collect a debt. It has been held that debtors' tender sensibilities are protected only from oppressive, outrageous conduct. (*McMenamin v. Bishop*, 6 Wn. App. 455, 493 P. 2d 1016; *Lewis v. Physicians Etc. Bureau*, 27 Wash. 2d 267, 177 P. 2d 896. [1947].)

The discussion involving debtor-creditor relationships by the Alabama Supreme Court to establish the parameters of the cause of action in *Norris v. Moskin Stores, Inc.*, 272 Ala. 174, 132 So. 2d 321 (1961) is enlightening. The court there stated:

"The mere efforts of a creditor, in this case the appellees, to collect a debt cannot without more be considered a wrongful and actionable intrusion. A creditor has and must have the right to take reasonable action to pursue his debtor and collect his debt. *But the right to pursue the debtor is not a license to outrage the debtor.* The problem of defining the scope of the right of privacy in the debtor-creditor situation is the problem of balancing the interest of the creditor in collecting his debt against that of the debtor in his own personality. Some courts appear to have struck that balance on the so-called 'rule of reason.' Thus in the recent case of Housh v. Peth, 99 Ohio App. 485, 135 N. E. 2d 440, 449, affirmed 165 Ohio St. 35, 133 N. E. 2d 340, the Ohio appellate courts asserted that "*a creditor has a right to take reasonable action to pursue his debtor* and pursuade payment, although the steps taken may result to a certain degree in the invasion of the debtor's right of privacy,' *but that the debtor has a cause of action for injurious conduct on the part of the creditor which exceeds the bounds of reasonableness.* We approve this statement.

"The phrase '*reasonable action' is of course not one for which exact legal definition can be prescribed. What constitutes 'reasonable' action must depend largely on the facts of the particular case.* In Housh v. Peth, supra, the creditor-defendant 'deliberately initiated a systematic campaign of harassment of the plaintiff, not only in *numerous telephone calls to the plaintiff herself every day for a period of three weeks, some of which were late at night, but also calls to her superiors over the telephone*, informing them of the debt * * * .'" Plaintiff 'was called out of the classroom in the public schools where she was employed three times within 15 minutes; * * * she lost a roomer at her rooming house because of the repeated calls, and was threatened with loss of employment unless the telephone calls ceased.' Housh v. Peth, 135 N. E. 2d 440, 449." (p. 177.) (Emphasis added.)

The courts have held that letters to employers coupled with frequent telephone calls, (*Booty v. American Finance Corp. of Shreveport*, 224 So. 2d 512 [La. App. 1969]), and calls to the debtor's neighbors calculated to annoy, embarrass and humiliate the debtor, (*Boudreaux v. Allstate Finance Corporation*, 217 S. 2d 439 [La. App. 1968]), are sufficient to create this cause of action.

Malice is not a necessary element in an action for invasion of privacy because the precise motives for invasion of privacy are unimportant. It is the defendant's action, rather than precise motives accompanying the act or conduct, that is the criterion of liability. (*Froelich v. Adair*, supra.)

We are persuaded that the restatement rule is the proper rule to adopt. A creditor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to the debtor is subject to liability for such emotional distress, and if bodily harm to the debtor results from it, for such bodily harm. In a debtor-creditor relationship, the actions of the tort-feasor are compensable when they would be highly offensive to a reasonable man.

Having determined that a cause of action does exist in this jurisdiction for harassment of a debtor by a creditor, we now turn to the points asserted on appeal.

The pretrial order in the instant case set forth the issues to be determined at the trial. Among these issues was whether Associates committed any wrongful act in contacting the appellant concerning her account. In that regard the appellant contended that Associates committed the following act:

"(*i*) Threats of repossession made to plaintiff in December of 1970 and in January of 1971, and threats of repossession made to her parents from November of 1970 through January of 1971, which were communicated to her."

The pretrial order was entered by the Honorable Howard C. Kline of the Sedgwick County District Court. When the matter was tried before the Honorable B. Mack Bryant, in another division of the District Court of Sedgwick County, Kansas, evidence regarding telephone calls made to the appellant's parents by Associates, concerning the delinquency of the appellant's account and the parents communication to the appellant of such telephone calls, was excluded as being irrelevant to the case.

The exclusion of this evidence is asserted by the appellant as error. We think the point has merit.

Counsel for the appellant proffered the testimony excluded in the absence of the jury.

The appellee justifies the trial court's ruling on the ground that the excluded testimony shows no more than that Associates called debtor's parents, who made several payments on her behalf, and that the content of those calls was, in no event, made known to the appellant by her parents.

The proffered testimony of Mrs. Shoffner, the appellant's mother, is to the effect that Mrs. Shoffner told Associates when they called that the insurance company should take care of the payment on the delinquent account; that Associates called both Mrs. Shoffner and her husband about the same time they were calling the appellant in November; that their calls to Mrs. Shoffner were the same as to the appellant—that is, they were going to ruin her credit; the record then discloses:

"Q. And their calls to you regarding the payment on this loan, you never really talked to Kay about that, did you?

"A. No, we didn't want her to worry about it.

"Q. And only until they became more, shall we say, threatening did you ever talk to Kay about the phone calls; isn't that correct?

"A. Yes."

There is no claim by the appellee that the appellant did not adequately proffer her evidence. The record is clear that on each occasion counsel for the appellant succinctly stated the substance of the testimony he wished to elicit by way of a proffer out of the jury's hearing, and each time the trial court sustained the appellee's objection based on relevancy. The proffer was in keeping with the requirements of K. S. A. 60-405, that the proponent of the excluded evidence make known the "substance" of the expected evidence.

The appellee contends when such proffered evidence is added to the meager case brought forth by the appellant, the evidence falls dramatically short of that required for a stated claim of invasion of privacy.

Whether the excluded evidence would bolster the appellant's case to show that Associates by extreme and outrageous conduct intentionaly or recklessly caused severe emotional stress to the appellant, thereby establishing a *prima facie* case, cannot be readily ascertained from the record. Certainly the excluded testimony was relevant to the issue being tried.

In view of the statutory requirement that only the *substance* of the excluded evidence be made known, it cannot be said the error concerning the exclusion of evidence is harmless. (See, K. S. A. 60-261.)

In commenting upon 60-261, *supra*, Judge Gard (Gard, Kansas Code of Civil Procedure, § 261) said:

"A count of Kansas decisions would reveal that there have been many more reversals for improperly excluded evidence than for the improper admission of evidence. This is as it should be. It should be a plausible assumption that a just decision is more likely than unlikely to result where the fact finder has all of the relevant facts before it, whether strictly admissible or not, and that any disadvatage to the complaining party would be more technical than real. This explains the growing liberality of the courts toward admissibility and the growing reluctance to grant a reversal because of the consideration of relevant evidence which is technically inadmissible. Such an attitude makes the 'cumulative evidence' approach quite realistic even in jury cases.

*"But it is by no means so clear that the exclusion of evidence which was properly admissible is presumably harmless. If any presumption were to be indulged the presumption would be that a just result could hardly be expected unless the fact finder has before it all of the relevant evidence which it is entitled to consider.* So the natural result is that courts have less difficulty in saying that the improper exclusion of evidence probably affected the verdict or findings." (pp. 280, 281.) (Emphasis added.)

Representative of the many cases where it has been held that the improper exclusion of evidence was reversible error in *Avery v. City of Lyons,* 181 Kan. 670, 314 P. 2d 307.

The principles of law guiding the resolution of the points on appeal are well known. Any evidence which has a tendency in reason to establish a material fact is relevant and may be admitted into evidence. (*Scogin v. Nugen,* 204 Kan. 568, 571, 464 P. 2d 166.) In ruling on a motion for a directed verdict the court is required to resolve all facts and inferences, reasonably to be drawn from the evidence, in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. (*Baze v. Groff,* 205 Kan. 736, 740, 473 P. 2d 59.) Comment *h* under § 46 (1) of the Restatement of Torts (Second), establishes that it is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so, and where reasonable men may differ, the question is for the jury to deteremine.

The record discloses that when Associates made the first call to the appellant in the latter part of 1970 concerning her delinquent account, the appellant referred Associates to Capitol Life Insurance Company for insurance benefit payments to be applied to her account. On the second call in December 1970 the appellant

again referred Associates to the health insurance policy and said that she did not think she was responsible for the payments. On the third call, when Associates told the appellant a repossession would ruin her credit, the appellant referred Associates to her attorney, and again on the fourth call she referred Associates to her attorney, apparently without any effort by Associates to deal with the appellant's attorney. At the time these calls were made Associates knew the appellant had been suffering from multiple sclerosis for almost one year.

The stress upon the appellant by reason of these calls, and the telephone calls made to her parents, caused the appellant to suffer a relapse of her condition in January 1971, thereby aggravating and causing permanent impairment of her condition.

Associates was informed on numerous occasions by the appellant and her parents that a claim had been made upon Capitol Life under the policy due to appellant's total disability. The trial court found from the evidence that Capitol Life had refused to pay without just cause or excuse. Both Associates and Capitol Life were subsidiaries of the same parent company.

Certainly creditors must be permitted to pursue reasonable methods of collecting debts, and debtors are protected only from extreme and outrageous conduct. Nonetheless, methods of collecting debts which might be reasonable in some circumstances, might also be regarded as outrageous in others where it is known that the debtor is particularly susceptible to emotional distress due to a disease such as multiple sclerosis. Here the appellant made claim for payments on an insurance policy which Associates had sold her.

While only the substance of the evidence excluded by the trial court was proffered, the proffer discloses Associates said to the appellant's mother "they were going to ruin [appellant's] credit"; and that when the calls from Associates became more threatening the appellant's mother talked to the appellant about them. When the details of the evidence excluded are presented in open court, the appellant's evidence may be sufficiently strengthened to make a submissible case for the jury.

Accordingly, the trial court erred in sustaining Associates' motion for a directed verdict.

The judgment of the lower court is reversed with direction to grant a new trial.