No. 49,207

SHERMAN L. WIEHE and MARY ANN WIEHE, *Appellants*, v. ROY E. KUKAL and JOANN KUKAL, and CHESTER L. HATTLEY, *Appellees*.

(592 P.2d 860)

Opinion filed March 31, 1979.

*Charles D. Kugler,* of DeCoursey & Kugler, of Kansas City, argued the cause and was on the brief for the appellants.

*James D. Howell, Jr.,* of Overland Park, argued the cause and was on the brief for the appellees.

The opinion of the court was delivered by

MILLER, J.: The issue presented in this appeal is whether a wife can recover damages for severe emotional distress which she sustained as a result of hearing and seeing a third person verbally abuse and physically assault her husband. Joann Kukal received judgment for $10,000 against Sherman L. Wiehe in Wyandotte District Court, based upon her claim that she suffered emotional distress following a fence line dispute between her husband and Mr. Wiehe. This appeal is from that judgment.

Concisely stated, the facts as disclosed in the trial of this action, when viewed in the light most favorable to appellees, are these: The plaintiffs-appellants, Mr. and Mrs. Sherman Wiehe, own a tract of land in Wyandotte County which abuts an abandoned railroad right-of-way. Across the right-of-way and also abutting on it are properties owned by the defendants-appellees, Mr. and Mrs. Roy Kukal and Chester Hattley. In September, 1973, Mr. Wiehe agreed in writing to level the right-of-way and to remove and replace the existing fence, all at no cost to the other landowners. The fence was removed and the leveling was completed in the fall of 1973. Mr. Wiehe did not replace the fence promptly, so on December 1, 1973, Mr. Kukal and Mr. Hattley started to do so.

Wiehe came out to where Kukal and Hattley were installing the

fence. Wiehe became incensed; he claimed that Kukal and Hatt-
ley were erecting the fence 10 to 15 feet over on his land. Wiehe
swore and shouted obscenities; he directed this language at
Kukal. Wiehe left and went inside his home to check his abstract
and to call his lawyer. He returned in 10 to 15 minutes, carrying a
pitchfork and yelling loudly.

During this second confrontation, Mrs. Joann Kukal heard the
ruckus from her kitchen. She came out of the house and walked to
a point some 30 to 35 feet from her husband. Wiehe waved the
pitchfork over his head towards Kukal in a threatening manner.
He raved and shouted at Kukal, calling him names and claiming
that Kukal was stealing Wiehe's land. Wiehe threatened to pull
the fence out with his Jeep, and to sue Kukal for everything he
could get. Though Wiehe made no oral threats of violence to
Kukal's person, he backed Kukal up without touching him, wav-
ing the pitchfork towards him, while he (Wiehe) was ranting and
raving about the location of the fence. Wiehe said nothing to Mrs.
Kukal, and made no threats or movements toward her. Mrs.
Kukal, fearing that Wiehe would harm her husband, screamed,
"Get away from that man, Roy." Hattley then asked Mrs. Kukal to
go in and call the police. She stood there as if she were in a trance,
until her daughter pulled her toward the house; then she went in
and called the police. Mrs. Kukal was nervous, frightened and
upset, and she didn't go outside of the house anymore that day.
Since then her health has been poor; she cries a lot, has no
appetite, has lost weight, and is depressed. Previously, she had no
health problems.

This action was commenced by the Wiehes on December 4,
1973. Mrs. Kukal consulted her family physician on December 7,
1973; he found no physical ailments and referred her to a psy-
chiatrist, Dr. Kenneth L. Grady. Mrs. Kukal has been under his
care continuously since that time for depression and anxiety. She
was admitted to the hospital for one day and later for about ten
days for evaluation and treatment; otherwise, she has been treated
on an outpatient basis. Dr. Grady testified that Mrs. Kukal was
very depressive, and that this was progressing to psychotic de-
pression. He gave his opinion, based upon reasonable medical
certainty, that her emotional disease was directly related to the
acts of Mr. Wiehe on December 1, described above.

Mr. and Mrs. Wiehe filed their petition on December 4, 1973, to

recover damages and the land which they claimed defendants had appropriated by setting the fence over on the Wiehe land. The Wiehes claimed that the true boundary line was the center of the abandoned railroad line, and that the fence erected by Kukal and Hattley was 10 to 15 feet beyond that line and over on Wiehe's land. Defendants filed answer and counterclaim on December 12, 1973, seeking damages. Included was a counterclaim for emotional distress against Wiehe, asserted on behalf of Joann Kukal. At the close of trial, the jury returned a verdict denying all of the damage claims and counterclaims except that of Mrs. Kukal; it awarded her damages of $10,000 against Mr. Wiehe. In addition, it answered a special question submitted, and determined that the boundary line was the center of the abandoned railroad line, where Wiehe claimed it was, and not where Kukal and Hattley had placed the fence. Motions for judgment notwithstanding the verdict, for a new trial, and to alter or amend the judgment by striking the damage award, were all overruled. This appeal followed.

Appellees move to dismiss the appeal for several technical reasons: for failure of appellants to timely file their statement of points with their designation of the record, as required by Rule No. 6(d), 214 Kan. xxiii; because of an error (since corrected) in the printed record on appeal; and for failure of the appellants to prepare their brief strictly in compliance with Rule No. 8, 214 Kan. xxvi. We have carefully considered each point, the record, and the arguments and briefs of counsel. Appellees have not been misled or prejudiced in any way. The motion to dismiss is overruled.

The claim for emotional distress, arising out of "outrageous conduct" where that conduct is directed at a third person, is within the sphere of tort law encompassed within Restatement (Second) of Torts § 46 (1965). In *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, 529 P.2d 104 (1974), a claim was asserted for damages because of intentional harassment by a finance company of a debtor at a time when the finance company knew that the debtor had contracted multiple sclerosis. We there discussed the rule contained in Restatement (Second) of Torts § 46 (1), which provides:

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional

distress, and if bodily harm to the other results from it, for such bodily harm." (p. 71.)

We said:

"We are persuaded that the restatement rule is the proper rule to adopt. A creditor who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to the debtor is subject to liability for such emotional distress, and if bodily harm to the debtor results from it, for such bodily harm. In a debtor-creditor relationship, the actions of the tort-feasor are compensable when they would be highly offensive to a reasonable man." (215 Kan. at 822.)

Subparagraph (1) of § 46 was also discussed and applied in *Bradshaw v. Swagerty,* 1 Kan. App. 2d 213, 563 P.2d 511 (1977).

However, we have never considered or had before us a cause of action based upon subparagraph 2 of § 46. This reads:

"Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

"(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

"(b) to any other person who is present at the time, if such distress results in bodily harm." (p. 72.)

Mrs. Kukal, as the spouse of the third person at whom the conduct (the assault) was directed, fits into the § 46 (2) (a) category.

One claiming injuries for emotional distress caused by outrageous conduct under § 46 (2) (a) must show:

(1) that the conduct was "extreme and outrageous";

(2) that such conduct was directed at a third person;

(3) that the claimant is a member of the immediate family of that third person;

(4) that the claimant was personally present when the extreme and outrageous conduct took place;

(5) that the claimant sustained severe emotional distress as a direct result of that conduct (whether or not the claimant sustained bodily harm); and

(6) that the person whose conduct is complained of "intentionally" or "recklessly" caused severe emotional distress to the claimant.

We consider first whether the conduct of Wiehe was "extreme and outrageous." In *Dawson* we said:

"[T]he extreme or outrageous character of the conduct complained of may arise

from the actor's knowledge that the other is particularly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.

. . . .

" 'A creditor has and must have the right to take reasonable action to pursue his debtor and collect his debt. *But the right to pursue the debtor is not a license to outrage the debtor.* . . .

" '*The phrase "reasonable action" is of course not one for which exact legal definition can be prescribed. What constitutes "reasonable" action must depend largely on the facts of the particular case.*' " (215 Kan. at 820-821.)

## Comment "*d*" of the Restatement, § 46, reads in part:

"Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

"The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam." (p. 73.)

Was the conduct of Wiehe "extreme and outrageous"? It consisted of a spontaneous verbal outburst, profane and disparaging, coupled with an assault upon Kukal, upon Wiehe's discovery that Kukal and Hattley were fencing part of Wiehe's land in with their own. That a landowner would "explode" upon such a discovery; that he would instantly berate and curse those responsible; that he would shout and rave at them; and even that he would move toward one of the persons in a threatening manner in order to cause the person to back away from the place where the fence was being installed, even though the latter conduct amounts legally to an assault, does not in our judgment amount to that extreme and outrageous conduct contemplated by § 46.

Disputes over boundary lines, over the cause of motor vehicle collisions, or over a multitude of real or imagined wrongs, are likely to cause tempers to flare; words (vulgar and otherwise) to be uttered in anger; fists—or anything else handy—to be shaken; and assaults to occur. Such happenings are wholly unplanned, spur-of-the-moment occurrences; unfortunately, they occur all too frequently. But we cannot say that brief outbursts constitute

"extreme and outrageous" conduct. We hold that Wiehe's conduct, uncommendable though it be, was not "extreme and outrageous" as a matter of law.

Another facet of the case requires comment. The final element of an emotional distress claim under § 46 (2) (a), listed above, is that the emotional distress must have been caused "intentionally" or "recklessly." There is no evidence that Wiehe had any prior knowledge of Mrs. Kukal's susceptibility to mental distress, and in fact the evidence is to the effect that her mental and physical health was good and she had evidenced no tendency toward mental or emotional distress or disease prior to the occurrence on December 1, 1973. There is no evidence that Wiehe intended to cause harm to Mrs. Kukal.

"Reckless" conduct was discussed in *Blackburn v. Colvin,* 191 Kan. 239, 380 P.2d 432 (1963). Justice Fatzer, speaking for the majority of this court, said:

"Reckless is an indifference whether wrong is done or not—an indifference to the rights of others. (*Stout v. Gallemore,* 138 Kan. 385, 391, 26 P.2d 573.) In popular use and by our decisions 'recklessness' is a stronger term than mere or ordinary negligence. (*K. P. Rly. Co. v. Whipple,* 39 Kan. 351, 18 Pac. 730.) In *State v. Custer,* 129 Kan. 381, 282 Pac. 1071, it was said:

"'. . . To be reckless, conduct must be such as to evince disregard of or indifference to consequences, under circumstances involving danger to life or safety of others, although no harm was intended.'" (p. 246.)

There is an enlightening discussion of reckless conduct in Restatement (Second) of Torts § 500 (a) (1965), pp. 587-588, as follows:

"**Types of reckless conduct.** Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him, and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.

"For either type of reckless conduct, the actor must know, or have reason to know, the facts which create the risk. . . .

"For either type of conduct, to be reckless it must be unreasonable; but to be reckless, it must be something more than negligent. It must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent. It must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so

result must be substantially greater than is required for ordinary negligence."

Thus we see that recklessness requires knowledge. The person who is reckless must have prior knowledge; he must know or have reason to know of facts which create a high degree of risk of harm to another, and then, indifferent to what harm may result, proceed to act. A driver who rounds a blind curve or tops a sharp hill on the wrong side of the road knows or has reason to know, before he does the act, that his conduct will likely cause injury to persons lawfully approaching in the opposite direction. He is charged with that knowledge.

Was Wiehe's conduct—ranting, raving, cursing, brandishing a pitchfork—reckless conduct towards Mrs. Kukal, a bystander? Should he have had reason to know that his acts might cause Mrs. Kukal severe and lasting emotional distress? Under the circumstances would the average person have anticipated such dire consequences? These queries must be answered in the negative. We find in the evidence and in our collective experience no reasonable basis for expecting, or for Wiehe to have expected, such results. The assault was not of a type and of such a nature as would ordinarily cause emotional injury to mere bystanders, whether they be members of the family of the person assaulted or not.

In summary, we hold that the acts of Sherman Wiehe, as disclosed by the record before us, do not constitute "extreme and outrageous conduct"; that there is no showing that Wiehe "intentionally or recklessly" caused Joann Kukal severe emotional distress; and that the evidence in this case is insufficient as a matter of law to establish a claim and impose liability under Restatement (Second) of Torts § 46 (2) (1965).

The judgment in favor of Joann Kukal and against Sherman Wiehe is reversed.

HERD, J., not participating.