Ronald·B. FENTON, Plaintiff,

v.

The PRITCHARD CORPORATION and Techsource Corporation, Defendants.

Civil Action No. 95–2156–DES.

United States District Court, D. Kansas.

May 30, 1996.

1438

Andrew C. Marquardt, Marquardt & Associates, L.L.C., Fairway, KS, for Ronald B. Fenton.

Gail M. Hudek, Paul F. Pautler, Jr., Kimberly A. Jones, Hudek & Associates, P.C., Kansas City, MO, for the Pritchard Corporation, Techsource Corporation, Black & Veatch.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on defendants' motion for summary judgment (Doc. 49). On September 26, 1995, the plaintiff Ronald B. Fenton ("Fenton") filed a first amended complaint consisting of eight claims against the defendants (Doc. 24). However, during a pretrial conference held before Magistrate Judge Ronald C. Newman on May 8, 1996, the parties narrowed the case down to three specific claims. Accordingly, this order addresses those three remaining claims only. They are as follows: (1) the defendants perceived plaintiff to have a mental or emotional disability and based on that perception defendants unlawfully terminated the plaintiff in violation of the Americans with Disabilities Act ("ADA"); (2) the defendants unlawfully discriminated against the plaintiff due to his gender in violation of Title VII, 42 U.S.C. § 2000e *et seq.;* and (3) the defendants intentionally inflicted emotional distress upon the plaintiff.

## I. BACKGROUND

The court considers the following to be the uncontroverted facts. This case stems from a failed romance. The plaintiff and a woman named Deloris Johnson ("Johnson"), both employees for defendant Pritchard Corporation ("Pritchard"), became involved with one another in September 1993. The plaintiff was an engineer and Johnson was a receptionist. At first, the courtship went swimmingly with Fenton purchasing flowers and expensive gifts for Johnson. There was even talk of marriage. But by late October 1993, the relationship had deteriorated and Johnson ended it. Within less than a month, Johnson and Fenton attempted a reconciliation but that too failed. Fenton continued to call Johnson and he came to her apartment door, and at least on one occasion she refused to come to the door.

In mid-December 1993, Johnson reported to her supervisor, Carroll Rowe ("Rowe"), that Fenton was calling her at work, coming by her desk, and sending her flowers and notes at work after she had told him she did not want to see him any more. She said this attention to her was unwelcome. Management of Pritchard discussed the situation with Fenton and instructed him not to contact Johnson at work and advised him to stay away from her altogether. He was told that his job was at risk if he contacted Johnson at work.[1]

Upon learning that Johnson had complained to management about his behavior, Fenton sent Johnson a menacing letter which stated, in part:

I have been thinking about you all afternoon and evening, terrible sickening thoughts, ugly realizations about what you are … how could I have misjudged you— not seen the black heart? … Bud and Randy both feel I should beat the hell out of you. I want to but I can't, I won't … I keep asking myself—could I have done something so terribly wrong that it turned the most exciting, beautiful woman I've ever met into a monster intent on hurting me and obviously trying to destroy me? … I would have done anything to please you, ever hear "I'll kill for you but I won't die for you?" … Hate/Love Ron.[2]

Even after Johnson complained to management about Fenton, he wanted a relationship with her and he continued to make contact with her. At some point between mid-December 1993 and early February 1994, Johnson called the police and reported Fenton's behavior.

In early February 1994, Johnson again complained to her supervisor regarding Fenton's behavior toward her and expressed her fear of Johnson.[3] Pritchard management met with Fenton on February 7, 1994, and informed him that Johnson had again complained of his behavior and that Fenton should stay away from Johnson at work. Fenton was again informed that if he contacted Johnson away from work and it negatively affected Johnson's job performance, it could result in serious repercussions for him. Similarly, Johnson was warned not to contact Fenton at work and she was urged to avoid contact with him that caused disruption at work. She was advised that if she contacted Fenton it could result in serious repercussions for her.[4]

In early March 1994, Johnson rekindled her relationship with Fenton for a few weeks but then ended it again. According to an Overland Park Police Department report, on March 24, 1994, Fenton saw Johnson in the parking lot of an area restaurant.[5] Fenton

---

1. Fenton denies that Pritchard management told him that if he contacted Johnson outside of work that he could be discharged or that his job was at risk.

2. According to Carrol Rowe, the supervisor to whom Johnson complained about Fenton, Rowe knew only that Fenton had left some "bad messages" for Johnson, but did not know the detail of those messages.

3. According to Johnson, she considered Fenton physically threatening. According to Fenton, Johnson was afraid of him because he showed her his gun collection.

4. Letters from Pritchard Management dated February 16, 1994, were sent to both Fenton and Johnson reiterating the admonishments communicated orally to them earlier that month.

5. The police report reflects March 24, 1994, as the date on which Fenton struck Johnson. However, March 31, 1994, is the date cited by both parties as the day of the battery.

then followed Johnson in his car. When Johnson realized Fenton was following her, she tried to elude him in her car. When she thought she had lost him, she drove to her apartment building. As she walked toward her apartment building, Fenton approached Johnson and struck her in the face. Johnson filed a police report and Fenton was charged with misdemeanor battery. In lieu of prosecution, Fenton agreed to participate in a diversion program wherein he was required to undergo counseling.

The day after the attack, Fenton left Johnson a phone message stating the following:

> You must be pretty desperate, Dee, if that's the best you can do is old fat Phil at work. Are you becoming the company whore now? How many guys at Pritchard do you think you can fuck? You make me sick. I'm disgusted at myself for loving you so much. And you've treated me like this. I'm disgusted at myself for slapping you. You're the only woman I've ever hit. I apologize for that. You did deserve it though. Dee, there's nothing more disgusting that a middle-aged old whore. How can you do that? I don't understand. How could I have been so wrong? Well, Dee, this is the third week you've gone ballistic again. Maybe it's time you get some help before you destroy yourself and other people right along with you. I feel sorry for you. I wish I could help.

After Fenton slapped Johnson, she reported it to her supervisor at work. She told the supervisor that she was afraid of Fenton. A few days after she was assailed, Johnson provided Pritchard's Human Resources Department with a written statement outlining the incident. Following the striking incident, other employees reported to Pritchard Human Resources that they were fearful of Fenton and Pritchard's management initiated an investigation into what to do with this increasingly disturbing situation. On questioning by defendant's management, Fenton admitted that he struck Johnson. By mid-April, Pritchard management had decided that Fenton would either be discharged or transferred to another division where he would have *no further contact* with Johnson. Two memorandums were drafted, one re-flecting the discharge and the other reflecting the transfer. However, neither memo was given to Fenton because Fenton—on April 15, 1994—submitted his resignation before a final decision could be made.

Before Fenton quit, Pritchard's director of Human Resources, Gerald Caraher ("Caraher"), met with Clifford Witherby ("Witherby") to discuss Fenton's situation. Witherby was a lead engineer who worked with Fenton. Caraher intimated to Witherby that it might be in the best interests of all parties if Fenton resigned.

Following the letter of resignation submitted by Fenton to Pritchard, Witherby approached Caraher on Fenton's behalf and asked if Caraher would write a letter stating that Fenton had been laid off so that Fenton could get out of his apartment lease. Caraher wrote the letter indicating that Fenton's employment was terminated due to a lack of work.

On April 22, 1994, Johnson was issued a written warning for disruptive behavior based upon her contact with Fenton after being advised by management that she should stay away from him. On April 4, 1995, Fenton filed his original complaint against defendants.

## II. DISCUSSION

### A. *The standard for summary judgment*

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmov-

ant. *Id.* "Only disputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos Nat'l Lab.,* 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. at 2552–53.

Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (interpreting Fed.R.Civ.P. 56(e)). Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. at 2552. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2552–53.

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues").

The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. at 2511.

**B. Fenton is not disabled under the ADA.**

The essence of Fenton's disability claim is that the defendants perceived him as having an emotional and/or mental disability that made him incapable of performing the essential job functions of his employment with the defendants. The perceived disability alleged was that Fenton was dangerous, a threat to other employees, unstable and that he might "go postal," or "go ballistic." [6]

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Congress promulgated the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," and to establish "clear, strong, consistent, enforceable standards" for scrutinizing such discrimination. 42 U.S.C. § 12101(b)(1)–(2); *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995). "The ADA does not, however, erect an impenetrable barrier around the disabled employee, preventing the employer from taking any employment actions vis-a-vis the employee." *Siefken v. Village of Arlington Heights,* 65 F.3d 664, 666 (7th Cir.1995).

Under the ADA, a plaintiff must establish that he is a *disabled* person within the meaning of the ADA, that he is qualified to perform the essential functions of his job either with or without reasonable accommo-

---

**6.** In his pleadings, Fenton never specifically alleges in clinical or diagnostic terms what psycho-

logical or physiological impairment Pritchard management believed him to be suffering.

dation and that he was terminated because of his disability. *See Wooten v. Farmland Foods,* 58 F.3d 382, 385 (8th Cir.1995). The ADA defines the term "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) *being regarded as having such an impairment.*" 42 U.S.C. § 12102(2) emphasis added).[7] The ADA regulations define mental impairment as "[a]ny mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h).

■■■■■ "A plaintiff has the initial burden of proving a prima facie case of discrimination." *Pouncy v. Vulcan Materials Co.,* 920 F.Supp. 1566, 1579 (N.D.Ala.1996). If the plaintiff meets that burden, the defendant must then articulate, some legitimate, non-discriminatory reason for the termination. *Id.* "If the defendant meets this burden of production, the presumption of discrimination created by the prima facie case 'drops out of the picture,' and the plaintiff has the ultimate burden of proving that [he] has been the victim of intentional discrimination." *Id.* (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

> In a case brought under the ADA, a plaintiff may prove a prima facie case by showing (1) [he] was in the protected class; (2) [he] was discharged; (3) at the time of the discharge, [he] was performing [his] job at a level that met [his] employer's legitimate expectations; and (4) [his] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*Id.* (citing *Ennis v. National Ass'n of Business & Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir.1995)).

■■■■■ Fenton fails to make a prima facie case because he cannot show that he is a member of the protected class, i.e., a person with a disability. Fenton admits he had no disability. However, as noted above, Fenton relies on 42 U.S.C. § 12102(2)(C) to assert

that Pritchard management *regarded* him as being mentally or emotionally impaired. "[T]he employer must perceive an impairment, and the employer must perceive that the impairment substantially limits a major life activity." *Pouncy,* 920 F.Supp. at 1580 (citing *Cook v. State, Dept. of Mental Health, Retardation, and Hospitals,* 10 F.3d 17, 22–23 (1st Cir.1993); *Chandler v. City of Dallas,* 2 F.3d 1385, 1392 (5th Cir.1993)).

■■■■ In this case, there is enough evidence offered by both sides to construe that Pritchard management perceived Fenton to be a violent person. The critical issue is whether Pritchard's perception of Fenton as a violent person was in reality a perception that Fenton was suffering from a mental or emotional disability. Further, to succeed on his "perceived disability" theory, Fenton must show that defendants *believed* that Fenton was disabled.

Fenton contends that because defendants received reports from other employees that Fenton was "unstable," that he could "go postal," that he could "go ballistic," that he had a "gun collection," and that he was a "Vietnam veteran," Pritchard management regarded him as being mentally or emotionally impaired. Also, according to Fenton, Pritchard management instructed Johnson to take the day off from work on Fenton's last day and to go get her dog and clothes and disappear for the weekend. Further evidence of management's perception of Fenton as being mentally or emotionally disabled.

No doubt, Fenton was regarded as being a violent person and his actions reveal a short temper. The slapping incident speaks for itself. The letter Fenton sent to Johnson and the message he left for her on her answering machine also reveal Fenton's anger and frustration. A co-worker, Kyle Kennedy ("Kennedy"), once honked his car horn at Johnson as Johnson was walking with Fenton through the company parking lot. Fenton, who apparently was startled by the honking, began hitting Kennedy's passenger window and making obscene gestures. When Kennedy later approached Fenton to apologize, Fenton flared up at Kennedy by

---

**7.** Subparagraph (C) has given cause to most claims of "perceived disability."

swearing at him that he "doesn't like that shit" and that he "doesn't put up with that shit," making more gestures and generally getting up in Kennedy's face. Kennedy reported the incident to his supervisor.

■ The defendants readily concede that Fenton was discharged due to his violent conduct which disturbed fellow employees, thereby disrupting the workforce. Nevertheless:

[t]o defeat a motion for summary judgment, the plaintiff must present evidence sufficient for a reasonable jury to conclude that the employer's articulated reason is pretextual by presenting concrete evidence in the form of specific facts that either show that a disability played an impermissible role in the employer's decision or that the proffered nondiscriminatory reasons are unworthy of credence.

*Pouncy,* 920 F.Supp. at 1579. Fenton defied two prior warnings to stop contacting Johnson because it was disrupting the workplace. Fenton caught up with Johnson outside her apartment and slapped her. He acted in a threatening manner toward Kennedy. Those acts alone sufficiently justify Pritchard dismissing Fenton. Fenton would have this court ignore that objectionable behavior and instead impute to Pritchard this contrived theory of perceived mental disability.

■ The legislative history of the ADA shows that "perceived disabilities" were included in the act to countervail "myth[s], fear[s] or stereotype[s]" regarding disabilities that frequently prevented able individuals with disabilities from obtaining employment. 29 C.F.R. pt. 1630, app. 1630.2(1). As noted in *Pouncy,* the regulations are equally clear that individuals with common personality traits such as poor judgment or a quick temper are not considered disabled. *Pouncy,* 920 F.Supp. at 1580 n. 8 (citing 29 C.F.R. pt. 1630, app. 1630.2(1)).

In *Pouncy* the plaintiff claimed that she was fired from her job due to her employer perceiving her as being mentally disabled. The court found that the defendant did perceive Pouncy as having some behavioral and attitude problems that adversely affected her work. "However, because Pouncy was never

diagnosed with any mental impairment, and indeed she claims she does not have a mental impairment, it is difficult to attribute her problems to anything other than her personality." *Id.* The court went on to hold that:

[P]oor judgment, irresponsible behavior and poor impulse control do not amount to a mental condition that Congress intended to be considered an impairment which substantially limits a major life activity and therefore a person having those traits or perceived as having those traits cannot be considered a handicapped person within the meaning of the Act.

*Id.* In *Pouncy,* there was evidence that the employers encouraged the plaintiff to seek long-term counseling and inquired whether the plaintiff had done so. Because of that encouragement and inquiry, the court was willing to assume for purposes of the summary judgment motion that the employers did consider the plaintiff disabled. The court went on to say that "[w]ithout such evidence, however, the court would be inclined to find . . . that the problems attributed to Pouncy are nothing more than common personality traits that are not entitled to protection under the ADA." *Id.*

In the instant case, the plaintiff adduces no evidence that the defendants encouraged Fenton to seek counseling or otherwise regarded Fenton as being mentally impaired. Fenton—in conclusory fashion—avers that Pritchard management believed he was mentally impaired because of what a few coworkers said about him. Fenton offers nothing to lead a trier of fact to find that defendants thought, believed or otherwise considered Fenton to be mentally or emotionally impaired. Defendants do acknowledge they believed Fenton had a propensity for violence, but that does not *ipso facto* connote a belief by Pritchard that Fenton was mentally disabled. There is evidence that other employees thought Fenton was "unstable" or would "go ballistic," or "go postal." But to impute those opinions or beliefs to defendants when there is no objective evidence demonstrating that defendants shared those opinions or beliefs, would be unjust.

■ Other courts have reached similar conclusions when confronted with plaintiffs

claiming perceived mental disabilities. In *Clark v. Virginia Bd. of Bar Examiners*, 861 F.Supp. 512 (E.D.Va.1994), the plaintiff suffered from depression which impaired her ability to concentrate, act decisively, sleep properly, orient herself, and maintain ordinary social relationships. However, the plaintiff did not claim that her impairments significantly affected her ability to work, go to school, learn, see or hear. *Id.* at 517. "Nothing in the ADA suggests that people suffering from such common difficulties must be singled out for protection under the [ADA]. In fact, the fourth Circuit has expressly rejected attempts to define disabilities so broadly that they include such commonplace conditions." *Id.* Turning to the instant case, people who become easily angered—such as Fenton—are commonplace. His low threshold of tolerance is not unique, nor does it merit recognition under the ADA.

A police department applicant failed his psychological examination and sued on a perceived disability claim in *Daley v. Koch*, 892 F.2d 212, 215 (2d Cir.1989). The court found that "poor judgment, irresponsible behavior and poor impulse control do not amount to a mental condition that Congress intended to be considered an impairment...." *Id.* at 215.

In the instant case, Fenton's actions in defying a company directive to not have further contact with Johnson and then slapping Johnson show poor judgment, irresponsible behavior and poor impulse control. They do not demonstrate that Pritchard management perceived Fenton to have a disability.

Because Fenton cannot prove that he is a member of the protected class, he has failed to prove a prima facie case of discrimination. Therefore, the court need not address the remaining three elements required to prove a prima facie case. Even if Fenton had proved a prima facie case, he cannot prove that defendants' articulated reasons for his discharge—his violent conduct and the disruption it caused in the workforce—were mere pretext for discrimination.

**C. Fenton was not wrongfully discriminated against.**

 Fenton's claim that he was discriminated against because he is a male is premised on differential application of workplace rules and procedures in violation of Title VII. Similar to ADA claims, the burden of proof in this type of claim shifts back and forth. First, the plaintiff must establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *Id.* at 253, 101 S.Ct. at 1093 (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824). If the defendant meets that burden, then plaintiff must have "opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.*

 Fenton was fired by Pritchard for misconduct, i.e., slapping a female employee after having been given two notices to leave her alone and demonstrating other violent tendencies.

[A] plaintiff fired for misconduct makes out a prima facie case of discriminatory discharge if he shows that he is a member of a protected class, that he was qualified for the job from which he was fired, and "that the misconduct for which [he] was discharged was nearly identical to that engaged in by [an employee outside the protected class] whom [the employer] retained."

*Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir.1984) (quoting *Davin v. Delta Air Lines, Inc.*, 678 F.2d 567, 570 (5th Cir.1982)).

 Fenton is a member of a protected class because he claims that he was discriminated against because he is male. However, Fenton cannot claim that his misconduct was nearly identical to that engaged in by Johnson, who—as a woman—is an employee outside the protected class. For several months after Johnson broke off relations

with Fenton, Fenton continued his amorous pursuit of Johnson. He called her frequently at work and home, sent her flowers and notes, visited her at her desk at work and generally attempted to revive their failed relationship. Fenton also left at least one threatening message for Johnson on Johnson's answering machine and also wrote a threatening letter to Johnson, wherein he acknowledged he was contemplating physical violence. Johnson complained to her supervisor in December 1993 and February 1994. Both Fenton and Johnson received warning letters from management to cease this disruptive relationship or suffer the consequences. Albeit, Johnson made the mistake of defying the company directive by rekindling the relationship for a short period in March 1994. However, Johnson again broke things off with Fenton (which Fenton did not take very well).

Fenton also defied the company directive by initiating contact with Johnson outside of work. However, Fenton behaved much more egregiously when he followed Johnson and confronted her outside her apartment and, after arguing with her, slapped Johnson. The slapping incident, in combination with the threatening communications from Fenton to Johnson and reports of Fenton's violent temperament from other employees resulted in Fenton being dismissed. Fenton cannot now claim that his behavior was nearly identical to that of Johnson's. Johnson did not persist in trying to make the relationship work by sending items of affection and notes to Fenton. She did not call him repeatedly either at home or at work. She did not write threatening letters to Fenton, nor did she leave threatening messages on his phone answering machine. She also never physically assaulted Fenton, nor did she behave threateningly or violently toward other employees.

Fenton's claim that he was discriminated against by Pritchard management because he is a man is groundless. He was fired because he behaved in a threatening and vio-

lent manner toward other employees, thereby disrupting the workforce. Accordingly, the court finds that Fenton has failed to prove a prima facie case of discrimination based on gender.

### D. Defendants' behavior was not outrageous.

Fenton's final claim against defendants falls under the Kansas common law tort of Intentional Infliction of Emotional Distress ("IIED"), sometimes referred to as the tort of outrage. Fenton maintains Pritchard management perceived him to be crazy, that he was terminated because of that perception, that Pritchard's reason for the termination was pretextual and discriminatory and that Fenton continues to be stigmatized as dangerous and the object of fear. According to Fenton, those facts are outrageous enough so as to allow a claim of IIED to go forward. The court disagrees.

"Kansas has set a very high standard for the tort of outrage." *Ginwright v. Unified Sch. Dist. No. 457*, 756 F.Supp. 1458, 1476 (D.Kan.1991). Proof of four elements is required to establish the cause of action: (1) the conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe. *See Roberts v. Saylor*, 230 Kan. 289, 637 P.2d 1175, 1179 (Kan.1981).

To constitute sufficiently extreme and outrageous conduct, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* at 1179.

There is a litany of cases where the conduct alleged failed to qualify as outrageous under the Kansas Supreme Court definition.[8]

---

8. *See Burgess v. Perdue*, 239 Kan. 473, 721 P.2d 239, 242 (Kan.1986) (after plaintiff's son died, defendant doctor informed her that he had the son's brain in a jar); *Hoard v. Shawnee Mission Medical Ctr.*, 233 Kan. 267, 662 P.2d 1214 (Kan. 1983) (defendants incorrectly told plaintiffs that their daughter had died); *Hanrahan v. Horn*, 232 Kan. 531, 657 P.2d 561 (Kan.1983) (defendant told class that plaintiff was a suspect in the disappearance and murder of his son); *Wiehe v.*

In most of those cases, the conduct was much more offensive than defendants' actions. In fact, defendants' actions reflect a corporation that recognizes the volatility of personal relationships. Pritchard management gave Fenton multiple warnings and appealed to Fenton to halt his disruptive behavior before it led to serious consequences. Fenton failed to heed those warnings and now tries to claim Pritchard's behavior was outrageous. Pritchard management did not go beyond the bounds of decency and act either atrociously or intolerably in handling this unfortunate situation.

**IT IS THEREFORE BY THE COURT ORDERED** that defendants' motion for summary judgment (Doc. 49) is granted.

*Kukal*, 225 Kan. 478, 592 P.2d 860 (Kan.1979) (defendant threatened plaintiff's husband with pitchfork).