**Nadine GINWRIGHT, Plaintiff,**

v.

**UNIFIED SCHOOL DISTRICT NO. 457, Ronald Brown, and Gerald Moseman, Defendants.**

**No. 88–1488–K.**

United States District Court,
D. Kansas.

Jan. 16, 1991.

Jack Focht, Focht, Hughey, Hund & Calvert, Wichita, Kan., for plaintiff.

Marc A. Powell and Mark E. Fern, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., for defendants.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

The defendants, Unified School District No. 457 and two of its officers, have moved for summary judgment against the plaintiff's civil rights action. Plaintiff Nadine Ginwright contends that she was dismissed from her teaching job in the district due to racial discrimination by the defendants. Arguments on the motion were made to the court in a hearing held January 4, 1991. For the reasons stated herein, the motion by the defendants is granted in part and denied in part.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the non-moving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.'*" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.

Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## FINDINGS OF FACT

Nadine Ginwright, who is black, was first employed by the defendant school district in August, 1983 as an elementary school instructor in Garden City, Kansas. Ginwright worked as a bilingual elementary instructor at the district's Buffalo Jones Elementary School. In August, 1986, Ginwright transferred to the new Edith Scheuerman Elementary School. Throughout the period relevant to this litigation, Ginwright was the only black instructor within the school district.

The parties' disagreement includes even the nature of the Ginwright's transfer. The defendants cite the deposition testimony of Ron Brown, the principal at Edith Scheuerman. Brown, who is white, had been an elementary principal in the district since 1980. According to Brown, he decided to hire Ginwright after she convinced him that an earlier incident at Buffalo Jones, in which she was reprimanded for the "indiscriminate grabbing/jerking" of a student, was a misunderstanding.

Ginwright avers that her transfer was approved by the then superintendent of the district, Dr. Jimmy Phifer. Brown was not given any option in the transfer process: Phifer told Brown that he could be the principal of the new elementary school, but that one of the new teachers would be Ginwright. When she later met with Brown, they discussed only educational philosophies and goals. There was no discussion of the incident at the Buffalo Jones School.

The new teachers at Edith Scheuerman were introduced before an assembly held at the beginning of the 1986 school year. Speaking to the 300 faculty and students attending the assembly, Brown introduced Ginwright as "the lady with the best suntan." Brown later stated that he was trying to identify the new teachers "in such a way as they would be remembered by the students." Brown also states that he introduced other new teachers by reference to their physical characteristics: the color of the dress, the color of their hair. In any event, according to Brown, Ginwright was amused by his remarks at the assembly.

Ginwright does not agree. According to her, none of the new teachers was identified by their physical characteristics. Only she was singled out. Ginwright did not feel entertained. She told Brown that she did not have a suntan, that "this is the color I am." Ginwright has stated that several teachers have told her that they considered Brown's remarks at the assembly to be unprofessional.

Among the many complaints made by the defendants against Ginwright's teaching, the first is raised in regard to an event occurring shortly after the school year began. The defendants state that Ginwright asked for assistance from another teacher in order "to perform the simple task of placing pages in her handbook in the correct numerical order."

Apparently, the intended inference is that Ginwright, a math instructor, is unable to follow a simple numerical sequence. In any event, as Ginwright points out in her response (and not contradicted by the defendants in their reply), no guideline for arranging the handbook had been provided, several pages in the handbook had been given the same number, and all of the teachers had to seek assistance to resolve the resulting confusion.

In October, 1986, a conflict developed between Ginwright and the school's white special education teacher, Donna Christiansen. One of Ginwright's students, Matt Meng, was designated to receive special education. However, the nature of the dispute between Ginwright and Christiansen is itself disputed between the parties. Brown has testified that Ginwright objected to special education for Meng and that the two teachers exchanged words over the subject. According to Brown, Ginwright

became emotionally upset and involved the rest of her class in a discussion of the issue. Ginwright reportedly criticized Meng,[1] saying, "He disgusts me."

These claims are denied by Ginwright. Ginwright states that she did not object to Meng's receiving special education. In her version of the dispute, Christiansen came into Ginwright's room when her class was in recess and complained that Meng was receiving too much homework. Ginwright told her that Meng had a B average, and was doing as well as his classmates. Ginwright's students began to return from recess. Although Christiansen continued to complain about the homework, Ginwright did not become emotionally upset. She did not "have words" with Christiansen.

Nor did Ginwright draw her students into the discussion. Rather, she asked them, as if taking a survey, whether she was giving them too much homework. About half said yes, half said no. Ginwright did not say that Meng disgusted her. At the end of the school day, Ginwright went to Christiansen's classroom and told her not to come to Ginwright's class and discuss educational matters while the children were present. Brown issued an oral reprimand to Ginwright over the matter.[2] Christiansen received no reprimand.

Brown later arranged a meeting to discuss Meng's need for special education. There is little agreement between the parties as to what occurred at the meeting, which was attended by Brown, Ginwright, Christiansen, and Meng's parents. Meng's mother stated that she had been having a hard time getting anyone to recognize his special educational problems. According to

Brown, Ginwright became "defensive" at the meeting. Brown also states that Meng's parents later told him that Ginwright began to treat him "differently" after the meeting. The defendants do not bother to explain the nature of this alleged difference.

Ginwright denies becoming defensive at the meeting. She told the mother that Meng had been working well in her class. However, the mother believed that Ginwright's class was made up of very high achievers, and that the work would be too fast for him to make up. Meng's parents therefore moved him to another school some time later.

The defendants have identified several additional alleged occurrences during October, 1986 which underlie their decision to terminate Ginwright's employment. The defendants allege: (1) that Ginwright missed an October 6 completion date for reading and management placement testing; (2) that her district art project was late; (3) that she missed the October 24 parent-teacher organization meeting; (4) that the head teacher had reported to Brown that Ginwright had become "huffy and rude" to the staff at another parent-teacher meeting; (5) that an unidentified parent had told Brown on October 14 that she had noticed changes in Ginwright's behavior and personality; and (6) that Ginwright had physically abused her teenage daughter. With the exception of the last of these allegations, the defendants offer almost nothing in the way of elaboration or explanation.

Ginwright responds that she did not "miss" the October 6 date for the reading and management placement testing; she had sent her response in early. The dis-

---

**1.** In their motion, the defendants make the claim that this criticism was delivered to Ginwright's entire class. This claim is clearly incorrect. The defendants' allegations are based on the October 8, 1986 memo sent by Brown to Ginwright, in which Brown reports hearsay statements of Ginwright's alleged criticisms of Meng. In the memo, Brown reports he was told by Meng's parents that they were told Ginwright had criticized their son. But as the memo makes clear, even taking these alleged statements at face value, the criticisms were not

made to the entire class, but to two of Meng's classmates.

**2.** Although Ginwright was given an oral reprimand, the reprimand was also written up and a copy was placed in Ginwright's personnel file. When she discovered the written copy of the oral reprimand in her file, Ginwright contacted Dr. Ron Lantaff, the district's director of personnel. The written copy was removed from Ginwright's file.

trict art project was an optional, not a required, activity. Ginwright acknowledges missing the October 24 parent-teacher meeting (and a second meeting in February of 1987), but states that she was ill and unable to attend the meeting. She also notes that her illness caused her absence from school on the same date.

Ginwright has no knowledge of the alleged statement of the unidentified parent to Brown that her behavior had changed. She observes that Brown never discussed the issue with her. Nor did he ever discuss with her the alleged comment of the head teacher that she had been "huffy and rude" at a parent-teacher meeting. Ginwright states that the alleged comment is untrue.

The parties discuss at length the child abuse charges against Ginwright. In charges filed by the Finney County District Attorney's Office, Ginwright was charged with abusing her 15–year–old daughter, Kabaka Ginwright. In an April 23, 1987 letter to the school district, Finney County Attorney Jay Hinkel summarized the allegations that had been made against Ginwright. The letter stated that Ginwright had whipped her daughter with a household electrical extension cord on three occasions on and around October 18, 1986. The whipping caused "visible red and bluish bruises, lacerations, and puffy flesh" to the daughter's back and upper arms. The letter stated that the complaint against Ginwright had been dismissed by agreement of counsel.

In her response to the motion for summary judgment, Ginwright acknowledges "administer[ing] corporal punishment to her [daughter] by whipping her with a cord." Ginwright states that the punishment occurred after her daughter had told her she would be staying overnight at a friend's house. When her daughter did not arrive home the following evening, Ginwright discovered that she had not stayed at her friend's, but had "engaged in improper, immoral and illegal activities with some college males at the college dormitory." According to Ginwright's affidavit, the charges against her were dismissed

with prejudice under a plea agreement in which Ginwright stipulated that her daughter was a child in need of care, that the district attorney would be permitted to relate the facts of the case to the school district, and Ginwright would continue to receive counseling from the local mental health clinic.

Whatever the true state of the other five allegations, and despite the allegation of child abuse, it is apparent that none of the matters to which the defendants now refer caused them to refuse to renew Ginwright's teaching contract in 1987. To the contrary, the annual evaluation report completed by Brown on February 9, 1987 was laudatory of Ginwright's teaching. At the time of the evaluation, Brown was aware of the charges of child abuse, and stated that "[t]his has been a difficult school year for Mrs. Ginwright."

However, Brown wrote that Ginwright had "not allowed her personal problems to effect [sic] her job performance for the most part." Ginwright, he wrote, had made "great year-long improvement" in her teaching skills. Concluding that she was "an outstandingly conscientious teacher," Brown recommended her renewal.

On February 14, 1987, Brown allegedly made additional racially-oriented remarks in Ginwright's presence. At a staff meeting in Ginwright's classroom, Brown stated that chitlins made him sick, and told of a black student he had known in Nebraska who ate peanut butter soup. The parties do not agree on the nature or context of these remarks. According to the defendants, who cite Brown's version of the incident, the principal merely made these comments in the context of a culture day, and that he "shared with [Ginwright] and her students" how he had tried chitlins when he had worked in Nebraska, but they had made him sick to his stomach. He also shared with them how one of his former black students had brought peanut butter soup to school. Brown said he had assumed it was because the student "didn't have anything else to bring," but that he had later learned that peanut butter soup is

an African dish, listed in a UNICEF recipe book.

Ginwright disputes Brown's recollection of the event. According to her, Brown's comments were not made in the context of a culture day. There were no students present, only faculty members attending the staff meeting. Nor, she states in her affidavit, was there any reason for the discussion of the subject. Brown's comments produced a tense atmosphere among the staff members, all of whom, except Ginwright, were white. After the meeting, one of the staff members told Ginwright, "He is a fool, and I mean a real fool to make a racial comment like that in front of staff members."

Ginwright's relationship with Brown began to deteriorate further, beginning with the allegation that Ginwright placed excessive restrictions on her students' recess time. On February 23, 1987, Brown allegedly received phone calls from the parents of two of Ginwright's students. These parents allegedly asked Brown that they remain unidentified, because "they were afraid that [Ginwright] might take her anger out on their children." The parents complaining of Ginwright's actions remain anonymous; they are identified neither in Brown's report of the incident nor in the defendants' brief to this court.

According to Brown, the parents told him that Ginwright had asked her students if they were getting too much homework, and most of the class raised their hands in response. Ginwright had a student take down the names of the students with their hands up. She then told those students that they would have no more recess for the remainder of the school year, and they could use the time to complete homework assignments.

The parents' complaints are recorded in Brown's written report of this incident. According to this report, Brown separately interviewed three of Ginwright's students about the matter. The report states that the students "were all in agreement as to what they had heard and understood." However, the report is entirely silent as to what the students reported. The report nowhere states, as claimed in the defendants' statement of facts, that the students' version of the event "corroborated the facts supplied by the parents." Brown issued a written reprimand to Ginwright on the day after he received the parents' telephone calls.

Ginwright has no knowledge of the phone calls received by Brown, but she denies the allegations made during those calls. Ginwright states that she did not allocate classroom time for performing homework. According to Ginwright's version of the incident, she had received a complaint that there was too much homework. She asked for a show of hands, and the majority indicated they felt they were receiving too much homework. She told the students that, at their option, they could either receive homework or perform their assignments during their 15–minute recess. Ginwright avers: "I felt it was my duty to prepare these sixth grade students for junior high where there is no recess, no study hall and more homework."

Ginwright states that the assistant superintendent of instruction, Dr. Creamer, told her that prior to his interview of the students, Brown had told him he wanted to reprimand Ginwright over the matter. Creamer told Brown that he could not reprimand Ginwright without some facts to substantiate the allegations. Brown then questioned the three students without her knowledge. The students later told her that while he was conducting his inquiry, Brown did all the talking and the students responded with a shake or nod of the head. Ginwright considers the incident a typical example of the way in which Brown would attempt to intimidate students and members of the faculty.

A few days after this incident, Brown allegedly was again contacted by the parents of two of Ginwright's students. These parents, identified in Brown's deposition as Mrs. Knapp and Mrs. Barber, complained about Ginwright's statements to her class regarding the upcoming spring break. Brown again interviewed some of Ginwright's students. Ginwright had reportedly told her students that she was

moving to New York over spring break, telling the students that Brown was "after her," and that she would not be returning. The following day, Ginwright called for a show of hands of the students who had told their parents about her statements the previous day. She then told the students, "Now I know who I can trust."

Ginwright states that during a discussion with her class as to their plans for spring break, she told her students she would be visiting her son and his family in New York. She did not tell them she was not coming back. She did not tell them Brown was after her. She did not later poll her students as to who might have reported her statements to their parents. But while she did not tell her students that Brown was after her, Ginwright states that the students certainly would have inferred this from his conduct, including his high visibility in her class and his frequent interrogation of the students. She also notes that owing to the small-town nature of the community, there were constant rumors about events in the school. Brown's actions fed these rumors, creating an atmosphere of tension which caused her students, "typical eleven and twelve-year olds," to believe that she would not be remaining long at Edith Scheuerman.

In April, complaints arose about Ginwright's student test scores. Ginwright permitted one of her students to post to their files the student growth test scores of the other members of the class. The defendants cite the testimony of Brown that these test scores were confidential, and that he had instructed the teachers to perform the posting of the test scores themselves. Ginwright responds that she understood Brown to mean only that the teachers would be unable to use the office secretaries to post the scores. The student who was assigned to post the test scores was placed in the hallway, where he performed the activity in plain view. Ginwright states that had she known there was anything wrong with assigning one of the students to perform the posting, she would not have done so in such a visible place. Finally, she observes that the use of

high-achiever students to post test scores had been permitted by the principal of Ginwright's previous school, Buffalo Jones Elementary. If Ginwright was in violation of school policy by permitting one of her students to post test scores, so also were the principal and many of the teachers of Buffalo Jones.

On April 13, Brown suspended Ginwright for one school day over the posting incident. In the notice of suspension sent by Brown, he stated that Ginwright was guilty of insubordination and improper conduct. The notice also referred to new allegations, although Brown offered no comment on their validity:

> Also, Mrs. Mary Knapp and John and Bonnie Wisenbaker allege that Mrs. Ginwright was discussing their children, Jennifer Knapp and Lorilynn Wisenbaker[,] in a derogatory manner with other parents during our Parent–Teacher Conferences last week. Nadine is seen as playing favorites among her students and using intimidation to keep her students and their parents from speaking up.

Brown concluded the notice of suspension with a statement that a "Plan of Assistance" was being developed for Ginwright.

Shortly afterward, the school district received a letter from Mary Knapp. Knapp's letter, which notes the dispatch of carbon copies to some 12 persons, including a representative of the local newspaper, charges the school district with negligence in failing to investigate and substantiate various allegations against Ginwright. Knapp charges Ginwright with the violation of students' civil rights, the imposition of undue stress on the students, and creating a classroom environment "in which children have observed and had opportunity to learn by her example manipulation, intimidation, unethical behavior, and disregard for human dignity."

The letter contained an enclosure, a laundry list prepared by Knapp of some 13 instances of alleged misconduct by Ginwright, including the Meng and spring

break incidents discussed above.[3] From this list, the defendants in their brief cite only three additional instances of alleged misconduct. These include (1) a statement by Ginwright to her class, with regard to the child abuse charges, that "they can't fire me, I'm black;" (2) speaking of one of her students, that she was "a bad influence [who] would never be anything in life;" and (3) that she had improperly conducted an SRA test in the class.

According to Brown's deposition, Charles Stones, the district superintendent, suggested a parent meeting to discuss the situation. Brown and Stones decided not to invite Ginwright to the meeting, apparently out of a desire for the parents with complaints to speak freely.[4] Fifteen families and four representatives of the parent-teacher organization attended the meeting. At the meeting, parents repeated the charges about Ginwright's failure to properly conduct the SRA test. Charges were also made that students had compared answers on an earlier student achievement test, a Pegasus Pace test. Mrs. Meng threatened to sue the school district over Ginwright's alleged treatment of her son.

Following the meeting, Brown conducted an investigation of the SRA testing in Ginwright's classroom. According to the allegations made at the meeting, Ginwright had allowed her students to work beyond the allotted time limit, use dictionaries, talk with each other, leave their seats, share answers, and check their answers against the answer key. Inquiring about the SRA testing in Ginwright's class, Brown asked four questions of eight randomly-selected students. The defendants cite the results of these questions as support for the suspension of Ginwright, although, as they modestly note, "The answers to the ques-

tions were not uniform." (Defs.' Brief at 15.)

To say that the students had differing memories of the exam is something of an understatement. Moreover, the students cited by the defendants as supporting the existence of alleged improprieties are consistently in the minority of the students surveyed.[5] Of the eight students, only two stated that students had been allowed to talk and compare answers. Only two of the eight remembered anything about being able to use an answer key to check their answers. Four of the students remembered being able to use dictionaries. Two of the eight stated that time limits were not followed; six state that time limits were imposed.

Brown received two further complaints. On April 16, Gayla Elliott wrote to Brown that Ginwright, in response to a raffle ticket contest, had said that "there was no way for her to win since her class was filled with mama's girls that were too lazy to help." Elliott stated that when t-shirts were delivered to Ginwright's class in connection with a parent-teacher project and her students cheered, Ginwright "severely reprimanded the class, had them lay their heads on their desks and called them a 'bunch of babies' and 'worse than second graders' for their outburst." On April 20, Brown received a visit from Carol Baker, who stated that she had transferred her daughter out of school because she was afraid of Ginwright's retaliation against her for Baker's negative comments about Ginwright at the April 17 meeting.

Ginwright denies the truth of the various allegations raised against her in April. She explains that the conflict with the Knapps and Wisenbakers, mentioned in Brown's April 13 suspension notice, arose from a

---

3. These allegations were repeated by Knapp in simultaneous letters to Scientific Research Association, Inc. and the American Civil Liberties Union.

4. The reason for not inviting Ginwright to the meeting is not entirely clear. The defendants misconstrue Brown's deposition, stating as a conclusion that Brown and Stones decided "it would not have been appropriate" to have negative things said in her presence. Brown's depo-

sition is misquoted, and reflects a concern for the parents rather than Ginwright: "we were worried about the parents who had negative things to say, saying things in front of Mrs. Ginwright that would not have been appropriate." (Brown Depo., at 201–02.)

5. An exception being the question of whether dictionaries were used in the exam, a matter on which the sample was evenly divided.

parent-teacher conference with the Knapps in which they wanted the Wisenbakers' daughter to sit in, and Ginwright refused. According to Ginwright, Mary Knapp stormed out of the conference before she could explain that the conferences were for parents only. Ginwright states that Knapp was also angry because she had given her daughter a "B" in reading, and felt that she was penalizing the daughter for having a sinus infection.

Ginwright agrees that Brown attempted to suspend her, but states that Brown sought to suspend her indefinitely. After issuing the suspension, Brown went into Ginwright's classroom and told her students that Ginwright was ill and would not be back for three weeks. Ginwright discussed the matter with Stones, and she was reinstated on the same day as the suspension and told to report for work the next day.

In her response to the motion for summary judgment, Ginwright denies each of the allegations contained in Knapp's April 15 letter. She also questions Brown's willingness to take Knapp's allegations serious. She states that Brown himself had acknowledged to her that Knapp lacked sound judgment and mature emotions. Brown stated in a staff meeting that Knapp was "not playing with a full deck." Brown also reported discouraging another teacher from using Knapp as a babysitter because she was not an emotionally responsible person.

Ginwright also disputes Brown's version of the events leading up to the April 17 meeting. According to her, she was told by Brown that there was going to be a meeting and that she would be permitted to attend. Ginwright then called Stones, to ask whether she should respond independently and directly to parent's questions at the meeting, or whether she should present an official school district line in response to questions. Stones was unaware of any meeting. Ginwright then went to Brown's office. In Ginwright's presence, Brown telephoned Stones, who told Brown that Ginwright should not be permitted to attend the meeting. Brown and Elliott were responsible for getting the parents to the meeting.

Ginwright did not attend the April 17 meeting. Nor did Brown ever attempt to discuss with her the allegations raised at the hearing. She states that the meeting was hardly one-sided, noting that many of the parents attending the April 17 meeting were very supportive of her. The parents making the allegations were Knapp, Mrs. Meng, and the Wisenbackers, along with "several parents who were concerned about the allegations made by the other parents but who did not have any particular information themselves."

Finally, Ginwright denies any improprieties in the administration of the SRA test. Of Brown's investigation of the allegations, Ginwright states her past experience is that Brown conducts the questioning in an intimidating and harassing manner so that he gets the answers he wants. Ginwright states that she imposed strict time limits during the test, did not allow the students to communicate with one another, and prohibited the use of dictionaries. She believes that some of the students are confused, and have referred to another growth test (the Pegasus Pace test), one in which dictionaries and movement around the room are allowed. Finally, Ginwright states that analysis of those students who did well on the SRA test indicates similar high achievement in tests given in subsequent years.

Ginwright also denies the allegations contained in Elliott's April 16 complaints. In response to the Baker complaint of April 20, Ginwright avers that she did not and would never treat a student unfairly because of a parent's comments.

Brown relieved Ginwright of her responsibilities as head of the math and science department on May 27, 1987. Brown has stated that he relieved Ginwright because of a parent's complaint that Ginwright had been late for a math contest. Brown also stated that he wanted to give Ginwright "as much time as possible" to concentrate on her "Plan of Assistance."

Ginwright acknowledges being informed of Brown's action in relieving her on May

27, the last day of the school year. She states however that she was the instructor who gave the math contest, and that she was not late. The parent making the complaint, Gayla Elliott, did not have a child in Ginwright's class. Brown did not discuss the math contest or the parent's complaint with Ginwright or try to obtain her story on the matter.

When the next school year began, the defendants presented Ginwright with a "Plan of Assistance." According to the defendants, a plan of assistance is generally a one-year plan to improve teacher performance deficiencies. Under the rules of the Garden City school district, a tenured teacher such as Ginwright cannot be nonrenewed unless she has first been placed on, and failed, a plan of assistance.

The plan of assistance presented to Ginwright on August 21, 1987 is a seven-page document.[6] It requires Ginwright to undergo psychiatric examination, establishes a system for monitoring Ginwright's classroom instruction, and requires her to follow a program to correct her errors cited in the plan's *"Statement of Deficiency."* This portion of the plan states that Ginwright's classroom teaching is not conducive to learning or student participation, that her behavior has been unprofessional, that she has disregarded school rules, and that she has evidenced "a pattern suggesting emotional instability or an inability to control your temper." The plan then states as established the various allegations made by parents of some of Ginwright's students, which have been discussed earlier. For example, in criticizing Ginwright's reaction to student expression, the plan offers specific examples:

A. You do not administer punishment privately.

B. You have belittled students in front of their peers.

C. You have made derogatory statements to students in front of the class and to other students' parents.

Of the various complaints and allegations advanced against Ginwright during the previous school year and referred to earlier, apparently none—with the exception of the child abuse allegation—are left out from the plan of assistance's catalogue of error. Despite this, when Ginwright contacted the new superintendent of schools, Gerald Moseman, about the proposed plan of assistance and asked why it was being issued, Moseman cited only one instance of improper behavior: the alleged child abuse. According to Ginwright, Moseman said that the school district "intended to monitor my behavior to see that it did not happen again." When Ginwright said that matter related only to her personal life rather than her professional life, and stated that she had already paid for the incident, Moseman allegedly responded, "You have not begun to pay for it."

After receiving the plan of assistance, Ginwright apparently underwent two psychiatric evaluations. The first examination was conducted at St. Catherine's Hospital in Garden City. The report of this examination states that Ginwright is "an intelligent woman with strong moral values. From the data gathered during this interview I don't see her as a danger to herself or others." The school district arranged for a second examination to be conducted by the Menninger Clinic.[7] The report to the school district produced by this examination characterizes Ginwright as a "depressed and angry individual." The defendants stress in their brief the report's statement: "If she is unable to respond to supervision or there are further incidents of concern in her interaction with the students, it would be wise to end her association with your school district."

6. The defendants cite Ginwright's deposition testimony in which she stated that, while at the meeting in which the Plan of Assistance was presented to her, she "tuned it all out" Ginwright states in her response that she was angry because she had earlier been led to believe that she would not, after all, be receiving a Plan of Assistance.

7. Ginwright states that the assistant superintendent wrote out her transportation authorization in front of her class, stating so that the class could hear, "Here is the ticket for your evaluation that you are required to do at Menningers."

The report obviously assumes as true the various prior allegations of "incidents of concern in her interaction with students," something this court cannot do. The report also states that Ginwright would perform at her best if she received supervision in a manner that was "supportive of her assets and guide her in a non-critical manner." Finally, according to the report, Ginwright's history indicates that despite the incident of alleged abuse with her daughter, there was no suggestion that she posed any danger to her students.

On November 24, 1987, Brown made his first (and apparently only) quarterly review of Ginwright's performance. Brown states in his report that Ginwright required further improvement in creating "an atmosphere conducive to learning." The report also states that "[a] great deal of improvement" is also needed to correct Ginwright's unprofessional behavior. In neither instance does the report provide any instance of misconduct on Ginwright's part. Noting his meeting with Ginwright regarding the quarterly review, Brown concludes:

> I thought it only fair to share with her at that time that, if this were March, 1988, she still has not reached the minimum teacher expectations of our district and I could not recommend her for renewal.

On February 22, 1988, Brown made his annual review of Ginwright's teaching. Brown states that numerous classroom observations of Ginwright had been conducted by himself, Dr. Stehno, and Laurie Francis. There had also been two observations using an "Instrument for the Observation of Teaching Activities" (IOTA) handbook. He then concludes, without discussing the results of those observations, that Ginwright had not lived up to the "minimum teacher expectations" of the school district. Brown also states that Ginwright was deficient in her relationships with faculty and parents, in her motivation of students, and her classroom control methods. Finally, Brown states that Ginwright "still exhibits unprofessional behavior" in dealing with parents and faculty. As with his earlier quarterly evaluation, Brown provided no elaboration or specific instances of misbehavior in support of these conclusions.

Only one specific instance of unsatisfactory behavior has ever been identified, either to Ginwright prior to her dismissal or to this court. On March 7, 1988, a conference report was issued by Brown in which he stated that he was "very disappointed" that she had not participated in or encouraged her students to take part in an evening "prime time reading" activity. The report indicated that this was a violation of two requirements contained in the plan of assistance: that Ginwright was to "reach outside the classroom to find out about your students," and that she "will discover the status of students among their peers by attending school events, by reading about them, and by talking with other students about them from time to time."

Ginwright denies the truth of Brown's report. She states that she encouraged her students to attend the program. She was present at the program for part of the evening, and indeed had spoken with Brown while she was there. According to Ginwright, she had also attended every other school activity, and had done so for the entire duration. She notes there were also a number of white teachers who failed to attend the prime time reading activity, none of whom were penalized by Brown for being absent.

At a meeting of the board of education on March 21, 1988, the assistant superintendent, Jon Hoerman, recommended that Ginwright's contract not be renewed. Board member Karen Tanner moved to give Ginwright notice of intent not to renew, and the motion passed unanimously. Tanner advanced four grounds for her motion: (1) that Ginwright lacked the instructional expertise necessary to teach in the school district, (2) that she didn't meet the district's "minimum teacher expectations," (3) that she had acted in an improper manner that was harmful to the children in her class, and (4) that her attitude was at times belligerent and obnoxious. Tanner had never met Ginwright, or been in her classroom. The contention that Ginwright lacked the "instructional expertise" necessary to teach her sixth grade class has not

been otherwise supported or mentioned by the defendants.

The notice of intent given to Ginwright on March 22 identified four reasons for the board's decision to nonrenew:

1. Your insubordination in attempting to operate outside the grievance procedures contained in the negotiated agreement of the district;

2. Your inability to meet and satisfy the minimum teacher expectations of the district;

3. Your failure to improve performance or correct deficiencies in accordance with your plan of assistance;

4. Your resistance to authority has required an excessive amount of supervisory assistance, and expenditures of district funds, in an effort to improve you performance of teaching duties.

Ginwright was informed of her right to a hearing on the board's decision. She initially requested a hearing, but on May 24, 1988, her attorney wrote the defendants that she was dropping her request for a due process hearing and would be pursuing her remedies under federal law. Tanner and Brown have averred that these actions were not motivated by Ginwright's race. After learning of her nonrenewal, 27 of Ginwright's students signed a parent-initiated petition asking the board to reconsider its decision.

Ginwright completely denies the truth of any of the various allegations made against her in the plan of assistance. Ginwright states that she was told by Brown's office staff that the plan of assistance was actually designed so that she could not live up to it. She also denies the contentions advanced for nonrenewal in the March 22 notice. The failure to utilize specified grievance procedures was raised for the first time in the notice of nonrenewal. Ginwright cites Brown's deposition testimony, in which he identified only her failure to attain "minimum teacher expectations," and was unable to identify the basis for the claim that Ginwright had violated grievance procedures.

In their statement of facts, the defendants try to support the charge that Ginwright violated the plan of assistance grievance procedure with the fact that four days after the plan came into effect, the school district received notice by the Kansas Commission on Civil Rights (KCCR) that Ginwright had filed a complaint against the district. The defendants contend that this action was a violation of the terms of the plan of assistance, which prevent the filing of complaints in any manner other than the procedure specified by the plan. The defendants' contention that there was a violation of the plan is not correct. While the school district received the KCCR's notice of the complaint after the plan came into effect, it is uncontroverted that Ginwright began the complaint process prior to the imposition of the plan of assistance.

Ginwright also denies the validity, and sincerity, of the defendants' claims that her teaching deviated from "minimum teacher expectations," or that the observations of her teaching indicated a deficiency. The term "minimum teacher expectations" has never been defined by the defendants. Though he met frequently with her, Brown never explained to Ginwright how her teaching deviated from "minimum teacher expectations."

Ginwright challenges the inference that any of the observations of her teaching conducted during the school year established any failure to meet "minimum teacher expectations." In his deposition, Brown acknowledged that it was not possible for an independent, unprejudiced observer to determine from the IOTA forms whether or not Ginwright failed to meet these expectations. Brown states in his deposition that the IOTA observation conducted January 8, 1988 does not show Ginwright as performing below minimum standards. None of the IOTA observations demonstrate a failure to meet minimum standards.

In his deposition, Brown was unable to point to anything in the IOTA records that indicate Ginwright failed to meet minimum standards. The IOTA records are not cod-

ed or graded. The IOTA handbook establishes no "minimum" against which the teacher's performance is compared.

Besides Brown, Ginwright was also observed by Dr. Stehno and Laurie Francis. According to Ginwright's affidavit, both Stehno and Francis told her that they had not been informed that their observations were done as a part of a plan of assistance imposed on Ginwright. Stehno told Ginwright that there was nothing wrong with her teaching methods.

In support of the claims raised in her complaint, Ginwright cites several alleged statements made by Brown during the 1987–88 school year. In January of 1988, Brown spoke with Ginwright shortly after the negative quarterly review in which he stated that he would recommend nonrenewal of Ginwright's contract. Brown allegedly told Ginwright that the people of Garden City were not used to blacks, and that she intimidated them because she was big and black. Brown told Ginwright that she would probably be happier in a city where there were more black people, such as Topeka. Ginwright understood Brown to mean that to advance her career, she would have to move, and that Brown did not believe a black person could succeed as a teacher in Garden City.

Brown admits that this conversation took place, but states that it occurred when he and Ginwright were "informally discussing life in Garden City." In Brown's version, Ginwright complained that Garden City's small black population made the town less enjoyable for her. Brown told her that he had recently met Topeka's black superintendent, and that he knew the city's schools had several black principals. Brown states that he made these comments merely to be "helpful."

The following month, Brown was in Ginwright's classroom. Pointing to a display of black dolls commemorating black history month on her bulletin board, Brown asked Ginwright if those were her "witchcraft dolls." Brown avers that his comment was "intended to be positive." He also states that he "promoted the observation of black history month and encouraged teacher par-

ticipation." Ginwright states that she took Brown's comment to be both racially hostile and negative. It was said, she avers, "with a hateful look and a voice that dripped with sarcasm."

Ginwright also alleges that the treatment she received from the defendants was different from that experienced by other, white teachers. In February of 1988, Ginwright complained to Brown that another teacher, Steve Smith, had lost his temper and yelled repeatedly at one of her students. Brown said that he knew of Smith's temper and that he was trying to deal with it. Later, when a friend of the student's family undertook an investigation of the incident, Brown prohibited Ginwright from making a true statement. Brown changed the statement submitted by Ginwright.

During the course of the investigation, Ginwright discovered that allegations of child abuse similar to the one made against her had also been made against Smith. Brown told Ginwright that he was aware of the allegations, but that he had investigated it and "found nothing was wrong with Mr. Smith." Smith was not placed on a plan of assistance. According to Ginwright, a former superintendent for the district, Dr. Jimmy Phifer, has stated that other employees, all white, have been reported for child abuse. These employees have received a simple warning, and have not been placed on a plan of assistance nor required to undergo psychiatric testing.

Finally, Ginwright also alleges the occurrence, in November of 1987, of another incident. According to Ginwright, several of her students reported to her that Brown had touched them in a sexually inappropriate manner. After she told Brown, he decided to reassure the students, telling them that his contacts were "generic." Brown told the students that rumors of the incident could ruin his reputation and lose him his job.

Brown reminded Ginwright that the plan of assistance prohibited her from contacting the students' parents and informing them of the allegations. Accordingly, she asked Brown to notify the students' parents of the incident. Brown called the par-

ents, but, Ginwright later learned, only told the parents that their children had been late for school.

The defendants deny this allegation, but offer no evidence in support of the denial. They state only that Ginwright's allegation is based on hearsay, and that it is "immaterial to the issue of alleged racial discrimination." A portion of the allegation is hearsay: Ginwright's description of what Brown told the parents when he telephoned. Otherwise, the allegations are both admissible and relevant. The incident is relevant to the claims of racial discrimination because, like the white teachers accused of child abuse, it indicates that when claims of abuse against students arose, minimal sanctions, if any, were imposed against white district employees, while serious restrictions were imposed on the district's only black instructor when such charges were made. In addition, the matter is relevant to Ginwright's claims for retaliatory discharge as a potential motivating factor in her nonrenewal.

In their reply, the defendants take repeated exception to the use of hearsay evidence in Ginwright's response.[8] It is a rather selective concern. Both parties, basing their statements of fact either on Brown's testimony and records or on Ginwright's averments, rely on large amounts of hearsay. For example, the defendants' assertion that Ginwright made derogatory comments about students is essentially treated as a substantive fact in the defendants' discussion of the plaintiff's Title VII claims (Defs.' Brief at 62–64), yet it is supported only by multiple hearsay: that Brown was told by a parent that she had been told by her child that Ginwright had made derogatory comments.

In the same vein, the parties' allegations regarding child abuse (whether by Ginwright, Brown, or Smith) are all predicated on hearsay. The defendants suggest that their hearsay is unobjectionable since the only thing which is relevant is that Brown heard these complaints about Ginwright,

not whether they were true. By this standard, the hearsay evidence offered by Ginwright is equally admissible. If Brown acted on complaints of child abuse against Ginwright, while ignoring similar complaints against white instructors, the plaintiff has provided evidence relevant to the elements of racial animus and pretext.

## DISCUSSION

### A. *Section 1981*

 The defendants present some 11 separate issues in their motion for summary judgment. Their first contention is that the plaintiff's claims pursuant to 42 U.S.C. § 1981 are no longer viable in the wake of the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). In *Patterson*, the Supreme Court held that racial harassment after the formation of a contract does not infringe the right to make or enforce a contract, and hence is not actionable under § 1981.

Although *Patterson* was silent on the matter, a majority of circuits have subsequently extended that case, holding that a racially-motivated termination of a contract receives no protection under § 1981. Seven circuits have held that contract terminations are not actionable under § 1981. *See Williams v. First Union Nat'l Bank*, 920 F.2d 232 (4th Cir.1990); *Wilmer v. Tennessee Eastman Co.*, 919 F.2d 1160 (6th Cir.1990); *Thompkins v. Dekalb County Hosp. Auth.*, 916 F.2d 600 (11th Cir.1990); *Reeves v. MCI Telecommunications Corp.*, 909 F.2d 144 (5th Cir.1990); *Gonzalez v. The Home Ins. Co.*, 909 F.2d 716 (2d Cir.1990); *McKnight v. General Motors Corp.*, 908 F.2d 104 (7th Cir.1990); *Walker v. South Cent. Bell Tel. Co.*, 904 F.2d 275 (5th Cir.1990); *Lavender v. V & B Transmissions & Auto Repair*, 897 F.2d 805 (5th Cir.1990); *Sherman v. Burke Contracting*, 891 F.2d 1527 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 353, 112 L.Ed.2d 317 (1990); *Overby v. Chevron USA, Inc.*, 884 F.2d 470, 473 (9th Cir.1989).

---

**8.** While the defendants make a general condemnation of the plaintiff's use of hearsay evidence, they do not bother to identify where, among the 65 paragraphs of facts in contention, the hearsay occurs.

The Eighth Circuit has held that a discriminatory discharge from employment remains actionable under § 1981 after *Patterson*. *Hicks v. Brown Group, Inc.*, 902 F.2d 630 (8th Cir.1990). *But see Taggart v. Jefferson County Child Support Enf. Unit*, 915 F.2d 396 (8th Cir.1990) (expressing disagreement with *Hicks*, but following for reasons of precedent).

The Tenth Circuit recently addressed a case of discriminatory discharge in *Hill v. Goodyear Tire & Rubber, Inc.*, 918 F.2d 877 (10th Cir.1990), but decided the case on other grounds. After noting the division of authority among the circuits, the court expressly refused to decide "whether discriminatory discharge claims such as plaintiff's are still actionable under section 1981 after *Patterson*." 918 F.2d at 881.

The district courts have generally read *Patterson* to bar claims for termination under § 1981. A minority of district courts have rejected this interpretation and held that § 1981 continues to protect against racially-motivated discharge. *See Kriegel v. The Home Ins. Co.*, 739 F.Supp. 1538 (N.D.Ga.1990); *Carroll v. Elliott Personnel Services*, 51 Fair Empl.Prac.Cas. (BNA) 1173 (D.Md. Nov. 22, 1989) (1989 WL 167678); *Asare v. Syms, Inc.*, 52 Fair Empl.Prac.Cas. (BNA) 1049 (E.D.N.Y. Sept. 20, 1989) (1989 WL 113162); *Padilla v. United Air Lines*, 716 F.Supp. 485 (D.Colo. 1989).

Kansas is unique in having a substantial number of cases falling on both sides of the issue. Three judges in the district have held that discriminatory discharges are not actionable under § 1981: Judge O'Connor, in *Boyd v. Telecable, Inc.*, 752 F.Supp. 388 (D.Kan.1990); *Anderson v. United Auto Workers*, 54 Fair Empl.Prac.Cas. (BNA) 763 (D.Kan. Apr. 17, 1990) (1990 WL 58791); *Payne v. General Motors Co.*, 731 F.Supp. 1465 (D.Kan.1990); and *Carroll v. General Motors Corp.*, 52 Fair Empl.Prac. Cas. (BNA) 185 (D.Kan. Oct. 27, 1989) (1989 WL 134285); Judge Rodgers, in *Dean v. Taco Tico, Inc.*, No. 85-4167-R (D.Kan. May 11, 1990) (1990 WL 78546); and Magistrate Reid, in *Thomas v. Beech Aircraft Corp.*, 52 Fair Empl.Prac.Cas. (BNA) 137

(D.Kan. Sept. 25, 1989) (1989 WL 110848). Two judges have held that actions for discriminatory discharge remain viable after *Patterson:* Judge Saffels, in *Foster v. Atchison, Topeka & Santa Fe Ry. Co.*, No. 88-4085-S (D.Kan. Jan. 11, 1990) (1990 WL 11062); *Booth v. Terminix Internat'l*, 722 F.Supp. 675 (D.Kan.1989); and *Birdwhistle v. Kansas Power and Light Co.*, 723 F.Supp. 570 (D.Kan.1989); and Judge Theis, in *Mayhue v. St. Francis Hosp.*, 748 F.Supp. 1484 (D.Kan.1990).

The court concludes that 42 U.S.C. § 1981 applies to the discriminatory termination of contracts. To hold otherwise would be to render the promise of the statute ephemeral, deceiving the hopes of those who require and deserve its intended benefits.

Unlike generalized harassment, which affects merely the terms and conditions of the worker's employment, termination "is directly related to contract enforcement." *Birdwhistle*, 723 F.Supp. at 575. "A person who is terminated because of his race, like one who was denied an employment contract because of his race, is without a job. Termination affects the existence of the contract, not merely the terms of its performance." *Padilla*, 716 F.Supp. at 490. The right to make contracts created by § 1981 would be rendered illusory if, by an arcane and semantic distinction, an employer is required to respect a prospective employee's right to make contracts, yet is permitted to terminate a contract a few moments after the contract has been in existence. If § 1981 is to have any meaning, the creation of the contract and its termination must be seen as two sides to a single coin.

In its decision in *Hicks v. Brown Group, Inc.*, 902 F.2d 630, 639 (8th Cir.1990), the Eighth Circuit stressed the inherent tendency of the majority rule to undermine the right to make contracts:

We refuse to construe Section 1981 as prohibiting an employer from refusing to hire someone based on her race, but then permitting the discharge of that same employee because of her race a month or a year later. Such an absurd interpreta-

tion would allow discriminatory discharge to effectively annihilate the right to make contracts. The right to make contracts would be rendered virtually meaningless unless it encompasses the right to be free from discriminatory deprivations of such contracts.

### B. *Title VII: Disparate Treatment*

■ The parties are in general agreement as to the legal elements of an action alleging disparate treatment under Title VII. Under the standard established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the plaintiff must demonstrate a *prima facie* case of discrimination. If the defendant is able to identify a legitimate, nondiscriminatory reason for its treatment of the plaintiff, the plaintiff must come forward with proof establishing that the proffered rationale was mere pretext, covering impermissible underlying discriminatory intent.

The defendants' arguments in support of their motion for summary judgment (at pages 53–69 in their initial brief, and pages 13–21 in their reply brief) can be summarized briefly. The defendants argue that Ginwright's claims of discrimination are conclusory or lack evidentiary support. They contend that their termination of Ginwright was legitimate, since she was an insubordinate, quarrelsome, insulting, emotional threat to her students. Finally, they contend that Ginwright cannot establish that their stated reasons were pretextual. The defendants take all of the facts from their statement of facts as true, and ignore any contradictions by Ginwright in her response.

The court finds that the defendants' arguments must be rejected. While their version of the events during Ginwright's tenure at Edith Scheuerman Elementary School may be found to be the true version when the matter is placed before the trier of fact, it cannot be accepted using the standards required for the resolution of disputed factual issues by summary judgment. Those standards require accepting the contentions of fact offered by Ginwright as correct.

And from that viewpoint, there was no legitimate reason for her termination. She committed no acts and made no missteps which were not also made by white instructors who were not similarly disciplined. Accepting Ginwright's version of the facts, the case may be summarized as follows. First, the defendants, via Brown, showed a consistent racial animus against Ginwright from the very first day at Edith Scheuerman Elementary, when she was introduced to the students as the teacher "with the suntan." No other teachers were singled out for introduction to their students by reference to their physical characteristics.

Brown continued to make racially-oriented remarks in Ginwright's presence. Without any legitimate reason to bring up the subject, and while in Ginwright's presence, Brown would remark to other persons that he hated chitlins, that black children ate peanut butter soup. Brown mocked the black dolls that were a part of Ginwright's black history month bulletin board display, sarcastically asking Ginwright in front of her class if those were her "witchcraft dolls." Finally Brown intimated to Ginwright that she would be happier—and enjoy greater career advancement—in a community with more blacks than Garden City.

There was no legitimate rationale for the defendant's treatment of Ginwright. Contrary to Brown's allegations, Ginwright did not insult students, she did not ignore required testing procedures, she did not violate clearly-established school policy. Her tests were properly conducted. She was supportive of her students, providing positive encouragement. The psychiatric evaluations performed on Ginwright in 1987 establish that Ginwright was no threat to the physical welfare of her students.

Ginwright was never rude, defensive, or emotional. Many of the other various allegations made against Ginwright—missing the dates for placement testing and an art project in 1986—are clearly minor events, unrelated to the defendants' treatment of Ginwright as a teacher. The incidents are not cited in any reprimand or censure of

Ginwright and are ignored in Brown's strongly positive evaluation of Ginwright's performance during the 1986–87 school year. In any event, of course, the allegations are directly denied by Ginwright.

Brown's evaluation of Ginwright's performance during the 1986–87 school year was highly complimentary of her teaching. In addition, the observers (other than Brown) who evaluated Ginwright after she was placed on the plan of assistance for the 1987–88 school year, Dr. Stehno and Laurie Francis, reached the same conclusion: that Ginwright was a very good teacher. The comments recorded in the IOTA handbooks, far from demonstrating a failure to meet "minimum teacher expectations," indicated that Ginwright was doing well in performing her classroom responsibilities.

Not only are the cited reasons for the nonrenewal of Ginwright's contract without foundation, there is direct and substantial proof of pretext. The reasons cited for nonrenewal in the board's March 22, 1988 notice are simply untrue. Ginwright is cited for her alleged failure to meet "minimum teacher expectations," a nebulous term undefined either for Ginwright or this court. In addition, the notice claims that Ginwright was insubordinate in "attempting to operate outside the grievance procedures" listed in the plan of assistance. This apparently relates to Ginwright's complaint to the state civil rights commission, yet it is uncontradicted that the complaint was made prior to the effective date of the plan of assistance. There is a clear inference of pretext which arises from the use of such manifestly incorrect justifications. This inference is bolstered by the defendants' reliance on minor events which were not the subject of censure at the time (such as the missed art project), and the allegations of persons such as Knapp, whom Brown had previously acknowledged was "not playing with a full deck."

Moreover, other white teachers accused of deeds similar to Ginwright's received no disciplinary action. White teachers at Buffalo Jones Elementary School allowed students to post test scores and were not disciplined. While Ginwright was repri-manded for her argument with Donna Christiansen, the school's white special education teacher, Christiansen received no reprimand. White instructors accused of child abuse were not required to undergo psychiatric testing. White instructors who missed the prime time reading program were not disciplined—only Ginwright received such treatment.

Finally, there is some direct evidence of pretext. The notice of nonrenewal states that Ginwright's contract is not being renewed because of her failure to meet the requirements of the plan of assistance. Yet the plan of assistance was not created to deal with Ginwright's alleged teaching difficulties. The acting superintendent of the school district reportedly told Ginwright that the plan of assistance was created because of her alleged child abuse, a matter for which she "had not begun to pay."

The incident of alleged child abuse occurred prior to Brown's positive evaluation. Yet Brown stated in his evaluation that Ginwright, "an outstandingly conscientious teacher," had not allowed her personal problems to affect her personal life. There is no evidence that Ginwright was ever a threat to her students. Indeed, the only evidence in the case is the psychiatric report indicating that Ginwright was *not* at threat. Taken together, the contentions of fact presented by Ginwright present a colorable claim of disparate treatment in violation of Title VII.

## C. *Title VII: Harassment*

■ The defendants seek summary judgment on the plaintiff's harassment claim raised under Title VII. The defendants contend that any racial remarks directed against Ginwright were too infrequent to rise to the level of a Title VII violation. In *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412–13 (10th Cir.1987), the Tenth Circuit discussed the requisites of a hostile working environment action under Title VII. The standard adopted is a high one. The plaintiff must demonstrate more than a few isolated racial slurs. Instead, the plaintiff must prove that he was subjected

to a steady barrage of opprobrious racial comment, *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir.1981); accidental, sporadic, or casual insults are insufficient. *Snell v. Suffolk Co.*, 782 F.2d 1094, 1103 (2d Cir.1986). The verbal abuse must so heavily pollute the working environment that the plaintiff's emotional and psychological stability is destroyed. *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).

In view of these significant requirements, the court views with some doubt the strength of the plaintiff's harassment claim. However, the court will reserve ruling on the defendants' summary judgment motion for two reasons. First, having concluded that the case must in any event proceed to trial on the plaintiff's other claims, the court will be in a better position to judge the strength of the plaintiff's harassment claim at that time. Second, it should be noted that while the verbal racial comments directed at Ginwright do not form a constant drone of abuse, these are not the only means by which an employee may be harassed or by which a hostile working environment may be created. It is Ginwright's position that, unlike white instructors against whom similar alleged misdeeds were reported, she alone was placed upon a plan of assistance, her classroom behavior scrutinized, and required to undergo psychological testing.

### D. *Title VII: Retaliatory Discharge*

■ Like her claim for harassment, Ginwright's claim of retaliation is not particularly compelling. Under the relevant standards for such actions, there must be a connection between the plaintiff's protecting activity relating to Title VII rights and the defendants' actions (here, the plan of assistance and nonrenewal). Ginwright here claims that she was punished by the defendants in retaliation for her complaint to the Kansas Civil Rights Commission. The record on the matter is unclear. The defendants do not appear to have received formal notice of Ginwright's KCCR complaint until after the plan of assistance was imposed. However, and again like her

claim for harassment, the matter can be addressed in a more satisfactory fashion at trial, when further evidence will be available. Accordingly, the court will reserve a decision on the plaintiff's retaliatory discharge claim.

### E. *Section 1983*

■ The defendants' motion will be denied with respect to Ginwright's equal protection claims under 42 U.S.C. § 1983. As may be seen from the defendants' argument (at pages 75 and 76 of their brief), their position is simply a repetition of their arguments made earlier under the disparate treatment claim: that there is no proof of intentional discrimination. For the same reason, the court will deny summary judgment. As discussed earlier with respect to Ginwright's Title VII disparate treatment claim, there is evidence from which an intent to discriminate can be inferred. Summary judgment on the matter would be inappropriate, and accordingly will be denied.

### F. *Due Process*

■ Ginwright's due process claim is hereby dismissed. When the notice of nonrenewal was issued, the board extended an opportunity for a hearing to Ginwright, which she waived in order to bring the present action. By doing so, as the plaintiff conceded at the hearing on the present matter, she waived any due process claims she may have had.

### G. *Pendent State Claims*

■ In addition to her federal claims, Ginwright presents four pendent state tort claims: outrage, wrongful discharge, defamation, and breach of privacy. The court concludes that summary judgment against these pendent claims is warranted. As the plaintiff concedes in her responsive brief, her wrongful discharge claim is effectively disposed of by *Polson v. Davis*, 895 F.2d 705 (10th Cir.1990) (holding that the Kansas Act Against Discrimination is the appropriate remedy for such claims). With respect to her other three pendent claims,

Ginwright makes no great effort to salvage them from the defendants' attack.

Kansas has set a very high standard for the tort of outrage, *Roberts v. Saylor*, 230 Kan. 289, 291, 637 P.2d 1175 (1981), and while the facts in the present case may set forth a claim for disparate treatment under federal civil rights laws, they simply do not approach the type of intentional mental abuse required for a claim of outrage. In addition, the qualified privilege asserted by the defendants (the disclosure of information relating to child abuse charges to a limited number of interested persons) is legitimately applied in the present case, which thereby negates plaintiff's claims for defamation and breach of privacy.

IT IS ACCORDINGLY ORDERED this 16 day of January, 1991, that the defendants' motion for summary judgment (Dkt. No. 24) is granted in part. The plaintiff's claims alleging violations of due process and Kansas state law are hereby dismissed. The defendants' motion is otherwise denied.